**Kenneth R. EVANS, Plaintiff,**

v.

**YEGEN ASSOCIATES, INC., Defendant.**

Civ. A. No. 81–3070–K.

United States District Court,
D. Massachusetts.

Oct. 13, 1982.
Order Jan. 11, 1983.

The case was tried before the court without a jury. Findings of fact are stated in parts I–X of this opinion. Evaluative findings and conclusions of law are stated in parts I, III–X.

## I.

This case is within the diversity jurisdiction of the court, under 28 U.S.C. § 1332. Plaintiff is a citizen of Massachusetts. Defendant is a corporation formed under the laws of the State of New Jersey with its principal place of business at Mack Center Drive, Paramus, New Jersey. The original complaint named the defendant as Yegen Marine Corporation. An amendment, filed with leave of court, correctly named the defendant as Yegen Associates, Inc.

Judith K. Wyman, James R. DeGiacomo, Roche, Carens & DeGiacomo, Boston, Mass., for plaintiff.

Robert Y. Murray, Peter M. Zuk, Ramsey, Serino, Murray, & Harrington, Boston, Mass., for defendant.

### Opinion

KEETON, District Judge:

This is an action for breach of contract (Count I), negligence (Count II), fraud (Count III); and unfair and deceptive acts as defined in Mass.Gen.Laws ch. 93A, § 2, for which multiple damages and attorney fees are provided in *id.*, § 11 (Count IV). The claims arise in the context of boatbuilding and financing contracts. First, CSY Yacht Corporation ("CSY") and plaintiff Evans entered into a contract (the CSY-Evans contract) for CSY to build at its boat yard in Tampa, Florida, and Evans to purchase, a CSY 44-foot Walk-through Cutter. Second, Yegen Associates, Inc. ("Yegen") and plaintiff Evans entered into a contract (the Yegen-Evans contract) by which Yegen agreed to provide financing in return for a note secured by a mortgage on the boat. Later, Yegen and Evans entered into a supplemental agreement regarding closing (the Yegen-Evans closing agreement).

## II.

The CSY–Evans contract was entered into on October 14, 1980 at a price of $183,872. On January 23, 1981, the contract was amended by "Addendum # 1" to add a roll-a-furl staysail, a jib, and a propane grill, and the price was amended to $186,566.77. The typewritten schedule of payments set forth in Addendum # 1 was this:

| Deposit | Paid | $5,000 |
|---|---|---|
| Molding | Paid | $40,000 |
| Decking | 2/16/81 | $74,950 |
| Balance | 3/10/81 | $66,616.77 |

Addendum # 1 acknowledged payment of $45,000, leaving a balance to be paid of $141,566.77. General Terms and Conditions of Sale of Addendum # 1, in printed form, included a provision on payments (¶ 3), which in relevant part was as follows:

The purchaser shall pay to the Builder ... in the following manner:

\* \* \* \* \* \*

(c) 7 days prior to the bonding and bolting of the deck to the hull, no less than 80% of the base price of the boat;

(d) Upon notification to the Purchaser, by the Builder that the boat is ready for launching, the balance of the total purchase price is due; ....

The Builder shall give prompt notice to the purchaser on the happening of the above events. The Purchaser shall have 10 days from the date of such notice to tender the appropriate payment.

Of the original price of $183,872, the amount of $33,972 was for the ABACO package. See Ex. 3. Thus the following comparison may be made:

| | | |
|---|---|---|
| Final price | | $186,566.77 |
| ABACO package | | 33,972.00 |
| Final price without ABACO package | | $152,594.77 |
| Addendum #1 (staysail, jib, grill) | | 2,694.77 |
| Original price without ABACO package | | 149,900.00 |
| | 80% | $119,920.00 |
| Deposit | $5,000 | |
| Molding | 40,000 | |
| Decking | 74,950 | |
| | | 119,950.00 |
| Balance | | 66,616.77 |
| | | $186,566.77 |

This comparison supports the inference that the "base price" referred to in the provision on payments in Addendum # 1 was meant to be the original price without the ABACO package—$149,900—80% of which was $119,920. The sum of the payments through decking was just $30 higher—$119,950. This comparison supports also the inference that substantial additional work was to be done between the time of "bonding and bolting of the decking of the boat to the hull" and the time when "the boat is ready for launching." This inference is relevant to the meaning of "ready for launching" and "ready for commissioning," considered in part V *infra*.

Paragraph 7 of the printed provisions of Addendum # 1 was as follows:

*Expected Delivery Date.* The Builder shall deliver the subject boat, completed in accordance with the specifications to the Purchaser by the date identified as the Expected Delivery Date on the reverse side of this page, but in the event of completion being delayed through amendments or additions to the specification or any cause beyond the exclusive control of the Builder, the above Expected Delivery Date shall be reasonably deferred.

The relevant typewritten provision on the reverse side stated the expected delivery date as "March, 1981."

The typewritten notation "ABACO" gave notice that the boat was intended for leasing to ABC Limited, a Bahamas charter operation, and that it was intended that the boat meet the standard specifications of the charter company. Included in the contract price was the cost, to be borne by CSY, of delivering the boat to the Bahamas and paying the duty required on delivery.

### III.

Negotiations leading to the Yegen-Evans contract commenced with Evans' application to Yegen, through its Boston office, for a loan to finance the purchase of the boat. In December, 1980, Yegen approved a loan of $137,904, at 16.75% interest over a 15-year term, to be secured by a mortgage on the boat.

Before the decking payment became due on February 16, 1981, under the CSY-Evans contract, Evans approached Yegen about temporary financing, which Yegen declined to provide. Evans borrowed from Old Colony Bank and Trust Company of Middlesex County, on a short-term basis at an interest rate one percent above prime rate, to enable him to make the decking payment of $74,950 on or about February 16, 1981.

The boat was not ready for delivery in March, 1981, the "expected delivery date" stated in the CSY-Evans contract. By April, 1981, because of cash-flow problems, CSY was pressuring Evans to make the final payment on the boat, even though it was far from complete. About April 8, 1981, Evans telephoned Paul Arvidson in Yegen's Boston office to report the pressure for payment and to discuss closing. Arvidson told Evans that Yegen would not make the loan proceeds available for closing until the boat was "complete," which Arvidson explained as "in the water and ready for commissioning."

On April 16, 1981, Arvidson sent a letter to John Van Ost, Jr. ("Van Ost") with copies to Evans and to John Lipman, who was in charge of Yegen's Tampa office, including the statement:

We will be prepared to close when the boat is completed which I understand will

be later this month or early May. We will handle all the paperwork including the documentation for Mr. Evans prior to closing . . . .

Evans testified to an oral agreement made in April between Evans and Arvidson, acting within the scope of agency on behalf of Yegen, that Evans need not and would not go to Tampa for the closing and that Yegen would inspect the boat before closing to make certain that it was "complete" and was "in the water and ready for commissioning." Evans' testimony is strongly supported by circumstantial evidence, including memoranda made in Yegen's Tampa file regarding a telephone call from Arvidson in Boston to Yegen's Tampa office. These memoranda include entries "we inspect boat," "Evans closes in Boston," "We close w/CSY final finish stage next week," and "We to inspect 4/15/81." Also a note was made on April 13, 1982 by William Kramer, John Lipman's assistant in Tampa:

> Paul A. says Evans won't close until boat is 100% complete. Boston will have documentation papers completed and signed.

I do not take this note as evidence of an agreement that all CSY's work on the boat was to have been done before closing. I do take it, however, as confirmatory of the understanding that Yegen was not to relax to any degree whatsoever the requirement that the boat be "complete" in the sense of being "in the water and ready for commissioning."

I find that Arvidson, acting within the scope of his agency on behalf of Yegen, entered into an oral agreement with Evans in April 1981 that Yegen would inspect the boat before closing and would not close until it was "complete" in the sense of being "in the water and ready for commissioning."

### IV.

CSY had begun to experience financial difficulties, including cash-flow problems, in 1980 or earlier. By February 17, 1981, these problems had become so severe that after a cutback on that date, the employees remaining were about half the number that had been employed at the peak of good times for CSY (about 300). The fact that CSY was having cash-flow problems was no secret in the community. Indeed, many of the survivors of the February cutback acquired and wore red shirts on which were exhibited the CSY logo and the inscription, "I survived 2–17–81." Confessore Deposition at 49–50.

When the impact of cash-flow problems began to be felt, CSY changed its practices and placed boats in the water for the first time at an earlier stage of production than before. As expressed by Van Ost, whose testimony on this point is not contradicted and is entirely creditable, "We were putting boats into the water for probably six months before Mr. Evans' boat that were not as completed as they should have been." Van Ost Deposition at 25. CSY's purpose in changing its practice was to get cash earlier to meet increasingly severe cash-flow problems. Secrecy regarding these cash-flow problems could not be maintained, and by February 17, 1981 publicly available information was such that a reasonably prudent person dealing with CSY would have been aware that CSY was in serious financial difficulty. Yegen (especially through its Tampa agent, Lipman, who had dealings with CSY from time to time because of Yegen's interest in financing the purchase of boats from CSY) had substantially greater knowledge than did Evans of CSY's financial difficulties and of CSY's changing practice of earlier launching of boats in an effort to meet its cash-flow problems.

Van Ost deferred the proposed closing date repeatedly in response to Lipman's inquiries about whether the boat was ready for closing. On or about May 18, 1981, Evans went to Yegen's Boston office and signed undated closing documents. Again Arvidson stated to Evans that Yegen would not close and make payment until the boat was completed—that is, in the water and ready for commissioning. The executed documents were received by Lipman in Tampa on or about May 23, 1981, together with an undated check in the amount of $66,616.77, payable to the order of CSY.

Lipman had been aware before the end of 1980 that CSY was experiencing some kind of financial difficulties, and by May 1981 he was aware that the problems were severe and that there was a substantial risk that CSY would go into bankruptcy.

After telephone communications between Lipman and Van Ost, Lipman went to the CSY boat yard on May 29, 1981, and for 30 to 45 minutes inspected the boat, which was in the water at a finger pier. He noted, among other things, that the mast had not been stepped, a window had not been installed, lifelines were not on the boat, fans and cabin lights had not been installed, the stove had not been installed, parts of the electronics were not on board, and refrigerator doors and a sink had not been installed. Lipman's inspection was insufficient for him to note incompleteness in other respects that a reasonably thorough inspection would have disclosed, including absence of running lights and seacocks that would have been installed, before the boat was placed in the water, had reasonably safe practice been followed by CSY.

Lipman proceeded with Van Ost from the finger pier to the CSY office and closed, dating and delivering the check to CSY and accepting the boat's Master Carpenter's Certificate and a Bill of Sale transferring ownership to the plaintiff. Lipman returned to his Tampa office, sent the completed documentation back to Yegen's Boston office, and thereafter took no action in relation to Evans' boat until Arvidson telephoned him in mid-June.

Meanwhile, on June 4, 1981, defendant paid off Evans' loan with the Old Colony Bank in Burlington by a payment of $73,-383.23. Yegen's loan to Evans was in the principal amount of $140,000, with interest at 16.75%. This loan was promptly assigned without recourse to The First National Bank of Boston.

## V.

According to the testimony of William J. Pignataro, which I especially credit on this point, when CSY was acting in conformity with its practices before the modifications incident to cash-flow problems, a boat would have been at least 90% complete before launching. As much as 10% might be done after the boat was moved out the door of the plant to make way for other boats on line (at which point it might be only 80% complete), but nevertheless before it was put into water. About 10% was done after the boat was in the water. Pignataro Deposition at 44–47. The earlier regularized practices employed when CSY was functioning at full scale had been so drastically modified by May, 1981, incident to difficulties such as unavailability of parts and labor as needed, that rather than an efficient assembly-line operation, CSY had come to what Pignataro described as

> guerilla boat-building at its finest. You couldn't run in a sequence unless the parts were there, and the manpower showed up every day. The procedure broke down, obviously.

*Id.* at 49.

A striking illustration of the prematurity of the launching of Evans' boat is that it was placed in the water when no mast was available. John Lipman's testimony that he saw a mast close by and assumed that it was for Evans' boat is heavily outweighed by the testimony of Van Ost that no mast had been obtained for Evans' boat when the closing occurred in late May. For safety reasons, a boat would not be left in the water for any substantial period of time— even as long as a week—without the mast in place because without the "balance" that the mast provided the boat would have a tendency to "bounce and sort of self-destruct." Pignataro Deposition at 62.

A second striking illustration of the prematurity of the launching of plaintiff's boat is that seacocks essential to protect the boat from sinking had not been installed. Instead, "through-holes" where they were to be installed had been plugged by temporary installations.

■ With respect to the meaning of "complete" in the sense of being "in the water and ready for commissioning" as used by Yegen and Evans in their supple-

mental agreement about closing, I find, first, that this phrase referred to a stage of production in which the boat was ready to be placed in the water to remain there until all CSY's obligations had been performed. Thus, it was not "in the water and ready for commissioning" when placed in the water in such a condition that good practice would require that it be removed from the water before all work was completed, either for safety reasons or because work remaining to be done could be more efficiently done with the boat out of the water. Second, I find that proof that the boat was "in the water" and that all additional work remaining to be done could be done without taking it out of the water is not equivalent to proof that the boat was "in the water and ready for commissioning" as used in the Yegen-Evans supplemental agreement about closing. Rather, this agreement contemplated procedures of production consistent with customary boat-building practices. This provision of the agreement about closing could not be satisfied by placing the boat in the water at an earlier stage of production, in violation of customary practice, and in circumstances making it reasonably expectable that the boat would be removed from the water after closing to do work that in ordinary practice would have been done before the boat was first placed in the water.

I find also that the date when the final payment was due to CSY under the CSY-Evans contract had not arrived on May 29, 1981. The phrase "ready for launching" as it appears in the printed provisions on payments means "ready for launching" in accordance with customary practices, under which the boat would not be launched while work remained to be done that ordinarily would have been done before the boat was launched. Thus, on May 29, 1981, final payment was not yet due under the CSY-Evans contract.

At the least, many additional items of work on plaintiff's boat, not completed by May 29, 1981, would have been completed had the boat been "ready for commissioning" and "ready for launching." These items included, for example, the bow pulpit and running lights, which according to undisputed evidence would have been installed in usual course before commissioning. Also, the mast would have been on hand, at least, if not in place.

Photographs were taken of the condition of the boat when plaintiff traveled to Tampa after mid-June to arrange for its completion. I find that these photographs fairly represent the condition of the boat at closing on May 29, 1981. The evidence does not support the suggestions advanced by Yegen that equipment installed in the boat before May 29 was thereafter, and before the photographs were taken, stripped from the boat by looters or by CSY personnel for use on other boats. There is creditable evidence that one or more CSY suppliers removed items that had been installed and were repossessed for nonpayment by CSY. The evidence is overwhelming, however, that the value of such repossessed items was insubstantial as a percentage of completion of the work on the boat. Thus, the photographs are reasonably accurate representations of the condition of the boat on May 29, and they are additional compelling evidence that no reasonable observer, familiar with industry practices, would have regarded a boat in such a state of disarray and incompleteness as being "ready for commissioning."

It is clear, then, that CSY placed plaintiff's boat in the water prematurely, in an effort to hasten closing to meet CSY's cash-flow needs, and with a clear expectation of removing it from the water after closing.

An additional reason for finding that the boat was not "ready for commissioning" at the time of closing on May 29, 1981 is that I credit the testimony of Mark Senner that when he first examined the boat before commencing work on it in late June it was "nowhere near" to being ready for the commissioning process. Senner Deposition at 14. Also corroborative is the testimony of William J. Pignataro, former CSY plant manager, Pignataro Deposition at 28 (more than ⅝ and almost ¾ complete, as estimated from hours of work to be done), and

John Van Ost, Van Ost Deposition at 25 (80% complete). Weighing all the various estimates of different witnesses, I find that the work on the boat itself (including items in the ABACO package but not the duty to the Bahamas and costs of delivery there) [1] was 75% complete on May 29, 1981, and that the work on the boat itself (as distinguished from that part of CSY's promised performance that concerned delivery to the Bahamas and duty payable to the Bahamas) would have been 90% complete had the boat been "ready for commissioning."

### VI.

■ I find that Yegen's actions in closing on May 29, 1981 were a material breach of the oral supplemental agreement between Yegen and Evans that Yegen would not close until the boat was "complete," that is, "in the water and ready for commissioning." Subject to determination of damages (see parts VIII–IX, *infra* ), I conclude that plaintiff has established a cause of action under Count I.

Counts II–IV present alternative theories of recovery for losses that Evans claims to have suffered as a result of Yegen's acts leading to and culminating in the closing on May 29, 1981. I proceed to consider findings and conclusions bearing upon each of these theories because of the possibility that different measures of damages might apply.[2]

■ By reason of the relationship created by the Yegen-Evans supplemental agreement regarding closing, Yegen had a duty of due care in the inspection of the boat before closing. The availability of a tort remedy, as well as a remedy for breach of contract, is clearly stated in Massachusetts precedents.

> When a party binds himself by contract to do a work or to perform a service, he agrees by implication to do a workmanlike job and to use reasonable and appropriate care and skill in doing it. . . . The count in tort states a cause of action as well as the count in contract. Although the duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort.

*Abrams v. Factory Mut. Liability Ins. Co.,* 298 Mass. 141, 143–44, 10 N.E.2d 82, 83–84 (1937). *See also Attleboro Mfg. Co. v. Frankfort Marine, Accident & Plate Glass Ins. Co.,* 240 F. 573 (1st Cir.1917); *Previews, Inc. v. Everets,* 326 Mass. 333, 94 N.E.2d 267 (1950); *Damiano v. National Grange Mut. Liab. Co.,* 316 Mass. 626, 56 N.E.2d 18 (1944); *Dorr v. Massachusetts Title Ins. Co.,* 238 Mass. 490, 131 N.E. 191 (1921). *See generally,* W. Prosser, Torts, § 92 (4th ed. 1971).

I find that in his limited inspection of the boat before closing on May 29, 1981, while acting in the scope of employment for Yegen, Lipman failed to exercise due care and, indeed, was as well more egregiously at fault as explained *infra.* I conclude that Evans has established a cause of action in tort under Count II, subject to the determination of damages.

■ In Count III Evans alleges that [d]efendant's conduct in accepting title and making payment therefor when it knew, or under the circumstances should have known, that the boat had not been

---

1. Yegen argues that the entire cost of the ABACO package (approximately $33,000) was for work to be performed after the boat was "in the water, ready for commissioning." I find, however, that the evidence does not sustain Yegen's contention. The ABACO package included more than 40 items. Among the largest were Roll-a-Furl Mast, $4,000; Sail Package, $5,685; Electronic Datamarine, $1,305; Hyde Streamstay (Tall Rig), $2,100; Refrigeration (engine driven), $3,517; Tall Rig, $1,425. These items, if not wholly or partly installed in ordinary course, would at least have been on hand before launching, and some of the work incident to their acquisition and installation would have been performed in regular course before the boat was launched.

2. Although not explicitly referring to any choice-of-law issue, both parties rely upon Massachusetts law and appear to agree that in this diversity-jurisdiction case Massachusetts law governs. *See generally Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

completed, constituted a fraudulent act practiced upon the plaintiff.

Under the law of Massachusetts, Evans is not required to prove specific intent to deceive (including knowledge of the falsity) to succeed in an action for fraud. *Powell v. Rasmussen,* 335 Mass. 117, 243 N.E.2d 167 (1969).

"[T]he charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made as of the party's own knowledge, which is false; provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge; and in such case it is not necessary to make any further proof of an actual intent to deceive."

*Id.* at 118, 243 N.E.2d at 168, quoting from *Chatham Furnace Co. v. Moffatt,* 147 Mass. 403, 404, 18 N.E. 168, 169 (1888). I find that in proceeding with closing on May 29, 1981 and reporting to Evans that closing had been effected in conformity with the Yegen-Evans supplemental agreement Yegen falsely represented as of its own knowledge that the boat was in the water and ready for commissioning. The matter represented was a matter susceptible of actual knowledge upon careful inspection of the boat. I conclude that, subject to the determination of damages, see parts VIII–IX *infra,* Evans has established a cause of action under Count III.

 Count IV alleges a claim for violation of Mass.Gen.Laws ch. 93A, §§ 2 and 11. Section 11 provides:

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action . . . for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

I conclude that the conduct of Yegen in closing when the boat was not in the water and ready for commissioning and in misrepresenting to Evans the condition of the boat were unfair and deceptive acts and practices proscribed by section 2 of Chapter 93A. Although section 2 offers no definition for an "unfair or deceptive act or practice," it incorporates the interpretation given to those terms by the Massachusetts Attorney General (*see* Mass.G.L. c. 93A, § 2(b)) and by the Federal Trade Commission under the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). Relying on FTC interpretations of these words, Massachusetts courts have stated that:

Those criteria require us in a case such as this to look for conduct which is (1) within "at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) . . . is immoral, unethical, oppressive, or unscrupulous . . . ."

*Levings v. Forbes & Wallace, Inc.,* 8 Mass. App. 498, 504, 396 N.E.2d 149, 153 (1979) (quoting 29 Fed.Reg. 8325, 8355 (1964)). *See PMP Assocs., Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 596, 321 N.E.2d 915, 917 (1975) (quoting and applying same criterion). A similarly broad criterion is provided in the Attorney General's Rules and Regulations, 20 Mass.Code of Regs. § 3.16: "an act or practice is a violation of chapter 93A, Section 2 if: (1) It is oppressive or otherwise unconscionable in any respect . . . ." Under either standard, acts of fraud clearly fall within § 2. Moreover, Massachusetts courts have consistently held that Chapter 93A expands common law notions of fraud. *See Heller v. Silverbranch Const. Co.,* 376 Mass. 621, 382 N.E.2d 1065 (1978); *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 322 N.E.2d 768 (1975). These decisions imply that ordinarily a valid common law claim for deceit is actionable under Chapter 93A if the claim otherwise satisfies the requirements of § 11. *See Levings v. Forbes & Wallace, Inc., supra,* 8 Mass.App. at 504, 396 N.E.2d at 154 ("A misrepresentation in the common law sense would, however, be the

basis for a c. 93A claim"). I find also, from compelling circumstantial evidence, that in proceeding as it did Yegen was motivated by its interest in a quick closing, lest CSY's escalating financial difficulties cause Yegen to lose the opportunity to complete a profitable 15-year loan of $140,000 at 16.75% interest, which Yegen expected to and did promptly assign to a bank without recourse. For these reasons, subject to the determination of damages (see parts VIII–IX *infra*) unless an exception under § 3 applies, Evans may recover from Yegen under Mass. Gen.Laws ch. 93A, § 11.

■ Section 3 provides in relevant part:

(1) Nothing in this chapter shall apply to

 * * * * * *

(b) trade or commerce of any person of whose gross revenue at least twenty per cent is derived from transactions in interstate commerce, excepting however transactions and actions which (i) occur primarily and substantially within the commonwealth . . . .

The parties have not offered direct evidence as to whether at least 20% of Yegen's gross revenue is derived from transactions in interstate commerce. Nevertheless, the circumstantial evidence before me about Yegen's business leaves no doubt on this matter. I find that at least 20% of Yegen's gross revenue is derived from transactions in interstate commerce. The question remains whether the "transactions and actions" that are the subject of this dispute did or did not "occur primarily and substantially within this commonwealth." The making of both the Yegen-Evans contract and the Yegen-Evans supplemental agreement regarding closing occurred entirely in Massachusetts. The actions amounting to breach and unfair and deceptive acts or practices occurred partly in Florida and partly in Massachusetts. The communication of the misrepresentation to Evans occurred entirely in Massachusetts. Taking account of all representations and acts relevant to Count IV, including those occurring in Florida, those occurring in Massachusetts, and those involving communications between the two states, I find that more of the "transactions and actions" relevant to Count IV occurred in Massachusetts than outside the state, thus satisfying the requirement that they "occur primarily and substantially within this commonwealth." Therefore, subject to the determination of damages, I conclude that Evans has established a cause of action under Mass.Gen. Laws ch. 93A, §§ 2 and 11.

## VII.

On June 15, 1981, Evans telephoned Van Ost to obtain the telephone number of the ABC Yacht Charters in the Bahamas, with the purpose of finding out how his boat was doing in charter service. To Evans' surprise, Van Ost reported that Evans' boat was still in the CSY yard with what Van Ost stated to be three or four days of work yet to be done. In fact, the work remaining to be done would have taken more time than that had CSY been operating at the peak of efficiency and with the maximum work force it had achieved in its finest hour. As Evans was soon to learn, the stated estimate was completely unrealistic in June, 1981.

Before terminating the telephone conversation with Van Ost, Evans obtained the telephone number of the charter service, telephoned, and talked with Wilhoyte there. As a result of his conversation with Wilhoyte, Evans became concerned about CSY's completion of the boat and telephoned Van Ost again. Van Ost stated that CSY's completion of the boat was being delayed by cash-flow problems.

Evans promptly telephoned Arvidson who telephoned Lipman late on June 15th and asked Lipman to go back to ascertain the boat's condition. Lipman called Arvidson on June 16th to report that the boat was out of the water, that work remained to be done, and that there was no mast for the boat.

On June 16, 1981, after Lipman had visited the CSY yard, Van Ost telephoned Evans and stated that the boat was out of the water and was less near to completion than he had previously stated. Van Ost agreed

to prepare a complete list of materials needed and an estimate of cost of completion.

After receiving the information on June 15 and 16, 1981, that his boat was substantially incomplete and not likely to be completed by CSY, Evans took prompt and reasonable steps to mitigate damages flowing from Yegen's material breach of contract. He traveled to Tampa, arranged for the boat to be removed from CSY's yard to an adjoining boatyard, in order to protect against risks that might materialize if CSY were to go into bankruptcy with Evans' boat still in its yard. He sought assistance in arranging for completion of the boat. Fortunately for Evans, and indeed for Yegen as well in view of Yegen's responsibility for damages caused by its breach, Evans was referred to Diane Bostow, whom he engaged to manage and expedite the removal of his boat to an adjoining yard and the completion of all work remaining to be done. She proved to be an extraordinarily capable and energetic representative. As a result of her effectiveness in securing the cooperation of CSY managerial representatives, engaging as workers three of CSY's former employees, determining what parts the workers would need and taking initiatives in obtaining them sometimes from CSY and at other times from various suppliers, the boat was completed in about five weeks—before August 8, 1981, the triggering date for a $1,000 bonus in addition to a $2,000 fee under her contract with Evans. I credit her testimony that her compensation was fair and reasonable and indeed that she might reasonably have driven a harder bargain had she foreseen the full scope of the time and energy required to get the job done. Yegen's challenge to Evans' claim that her services and the compensation paid for them were reasonable and necessary to the mitigation of damages flowing from Yegen's breach is without merit.

## VIII.

I find from a preponderance of the evidence that Evans expended the following sums to complete the boat and to effect delivery in the Bahamas (as CSY was obligated to do in consideration of the contract price, the last installment of which was fully paid to CSY when Yegen delivered its check of $66,616.77 at the closing on May 29, 1981), that these expenditures were reasonable and necessary to complete the boat and place it in use, and that these expenditures served to mitigate damages that might otherwise have resulted from delay in completion of the boat and delivery to the Bahamas:

| | | |
|---|---|---|
| (1) | Materials, labor and other charges to complete the boat | 34,333.75 |
| (2) | Cost of delivery to the Bahamas | 4,265.21 |
| (3) | Duty paid to the Bahamas | 10,208.00 |
| | Subtotal | 48,806.96 |

I find also that Evans reasonably took time from his regular employment to give attention to completion of the boat, resulting in loss of employment income as stated in item (4), and reasonably incurred personal travel and telephone expenses, as stated in item (5):

| | | |
|---|---|---|
| (4) | loss of employment income because of loss of time at work | $2,750.00 |
| (5) | personal travel and telephone expenses to oversee completion of the boat | $1,440.60 |

I find that Evans reasonably incurred the following additional loss as a result of delay in completion of the boat and delivery to the Bahamas:

| | | |
|---|---|---|
| (6) | loss of rental income from charter service in the Bahamas through 1981 because of delayed delivery | $10,725.75 |
| | Subtotal of items (4), (5), and (6) | $14,916.35 |

I find further that CSY's breach of the Evans-CSY contract, by substantial and material failure to complete its performance before May 29, 1981, was a cause of the losses in all six of these categories. Whether Yegen's breach was also a cause of

part or all of these losses remains to be considered in part IX, *infra.*

The last of Evans' claims of loss, and the grand total, are as follows:

| | | |
|---|---|---|
| (7) | interest expense on the debt, assigned by defendant to The First National Bank of Boston, between May 29, 1981 and August 7, 1981 | $ 4,259.70 |
| | Grand Total | $67,983.01 |

I find that Evans did sustain interest expense because of CSY's breach, since that breach caused Evans to incur interest on temporary financing for a longer period of time. This period of added interest expense commenced before May 29, 1981 and continued beyond that date. Evans does not claim that Yegen became responsible for all this interest expense and the evidence does not show the amount of this loss. Evans does make a claim against Yegen, however, for interest expense on debt for the period May 29, 1981 (the date Yegen closed with CSY on Evans' behalf) through August 7, 1981 (the date of delivery of the boat in the Bahamas). Evans seeks to measure this loss by the amount paid on the Evans-Yegen loan between May 29, 1981 and August 7, 1981—$4,259.70. The relationship of this expense to the CSY breach differs from that of the other six items listed above. Had CSY performed fully and on time, Evans would have been paying interest to Yegen in the period May 29—August 7, 1981, though not necessarily in precisely the amount he did pay in this period, because the loan would have been consummated even before May 29, 1981. I need not explore this relationship further, however, since in any event, for reasons explained in part IX, *infra,* this claim for interest must be denied.

## IX.

The determination of damages in this case presents issues centered around the application of concepts of causation.

Under each of the legal theories presented in the separate counts of the complaint, in order to establish the amount of recovery Evans must prove the amount of loss caused by Yegen's breach of contract or tort. In relation to a claim for breach of contract, the Supreme Judicial Court of Massachusetts has stated that damages are recoverable for harms which

> flow according to common understanding as the natural and probable consequences of the breach and [which] may be presumed to have been in the contemplation of the parties at the ·time the contract was made.

*Bucholz v. Green Bros. Co.,* 272 Mass. 49, 54, 172 N.E. 101, 103 (1930). An alternative formulation stated in *Bucholz,* on which Evans relies here, is that a plaintiff is entitled to

> damages sufficient in amount to compensate him for the loss actually sustained by him, and to put him in as good position financially as he would have been in if there had been no breach and he had completed the contract.

*Id.* at 54, 172 N.E. at 103. Thus, in citing *Bucholz,* Evans correctly recognizes that, as to any element of damages claimed, he must at least satisfy the but-for causation rule. As indicated in the additional passage from *Bucholz* quoted above, however, he must also show that the harms for which he claims damages were "natural and probable consequences" of the breach and were "in the contemplation of the parties."

Closely analogous if not identical requirements apply to Evans' tort claims. He must satisfy both a but-for requirement and a "natural and probable consequences" requirement. *See, e.g., Ford v. Trident Fisheries Company,* 232 Mass. 400, 122 N.E. 389 (1919); *Hill v. Winsor,* 118 Mass. 251 (1875).

I turn first to the but-for requirement.

Evans argues for recovery of the total claimed losses of $67,983.01, without calling attention to any basis on which the court could find that each item claimed is a loss that Evans would not have suffered but for Yegen's breach—that is, a loss that Evans

would not have suffered if defendant had complied with its contractual obligation to plaintiff not to close before the boat was "in the water and ready for commissioning."

On the evidence before me, however, I find that some of these losses would have been incurred by Evans even if Yegen had committed no breach. Yegen's refusal to close would not have resulted in immediate completion of the boat by CSY. Instead, the boat would have been in the CSY yard, incomplete, and Evans would have had a cause of action against CSY for breach of the CSY-Evans contract—a claim legally valid to the full extent of Evans' resulting losses but plainly worth something less. It is true, as Evans argues, that the last installment would have remained available to Evans and Yegen. But the boat would not have been in their control, and it cannot fairly be said as a practical matter that, as Evans argues, he could have used all the last installment to cover his losses. Thus, before Yegen's breach Evans was already destined to sustain some loss because of CSY's breach and CSY's precarious financial condition. Any loss plaintiff would nevertheless have incurred because of CSY's breach, even if Yegen had performed according to the Yegen-Evans agreement, was caused solely by CSY's breach. It was not caused by Yegen's breach.

If, instead of acting as it did in breach of its duties to Evans, Yegen had carefully inspected the boat on May 29, 1981 and had promptly given Evans a correct report of its condition, the closing of May 29 would not have occurred. I find that Evans would then have attempted to proceed in essentially the same way he did in fact proceed in mid-June, after discovering Yegen's breach. In these circumstances, I find that Evans would still have suffered loss of employment income and incurred personal and travel expenses similar in amount to those stated in items (4) and (5) in part VIII *supra.* I also find that Evans would not have been able to reduce the loss of charter income—item (6)—because it was then already too late to complete the boat and deliver it to the Bahamas for use in the 1981 charter season. It may be argued that interest expense on the debt assigned to The First National Bank—item (7)—was increased by an amount allocable to the time between May 29 and mid-June or later. Evans has failed to satisfy the burden of proof, however, with respect to establishing any additional financing costs during this interim period. Increased debt service attributable to Evans' becoming obligated on May 29 (rather than in mid-June or later) for interest on the Evans-Yegen loan was at least partially offset by the savings to Evans that resulted when Yegen paid off Evans' short-term loan with the Old Colony Bank on June 4, 1981. Moreover, the effect of earlier commencement—and therefore earlier termination—of the 15-year term of the loan has been disregarded in asserting that all interest paid between May 29 and August 7 is loss caused by Yegen's breach. In the absence of specific evidence as to the interest rate of the Old Colony Bank loan—apparently higher than that of the Evans-Yegen loan—and in the absence of evidence of the impact of earlier termination of the 15-year loan, it is conjectural what additional financing costs, if any, Evans may have sustained as a result of Yegen's breach.

A point of broader significance applies to all the losses Evans claims against Yegen and demonstrates that part of these losses was already destined to be unavoidable before Yegen's breach. Just before Yegen's breach on May 29, 1981, the boat was in the CSY yard, incomplete, and Evans had a valid legal claim against CSY. Yegen's breach did not destroy Evans' claim against CSY. The CSY-Evans contract provided for payment of the final installment of the purchase price before CSY had completed its performance. The terms of the closing on May 29 did not terminate CSY's contractual commitment. CSY remained obligated after the closing to complete its performance, and Evans continued to have a cause of action against CSY for CSY's failure to do so. Yegen's breach did, however, seriously impair the enforceability and value of Evans' claim against CSY. Before Yegen's breach, Evans was entitled to withhold the

final payment until it was due under the terms of the CSY-Evans contract. After Yegen's breach, that final payment was already in CSY's hands and Evans no longer had the bargaining power that the legitimate withholding of the final payment would have provided.

Because it is clear from the evidence that, had there been no breach by Yegen, Evans would have proceeded in essentially the same way as in fact occurred to realize the maximum value of his claim against CSY, we may determine the amount of loss that Yegen's breach caused by determining the extent to which Yegen's breach impaired the monetary value of Evans' claim against CSY, and thus reduced what Evans was, by reasonable diligence, able to realize from that claim.

The valid legal claim that Evans had against CSY, before Yegen's breach, would have entitled Evans to relief placing him in the same position he would have occupied had CSY and Evans both completed promised performance on time. The only promise of Evans not performed before May 29, 1981 was the promise to pay the final installment ($66,616.77). Thus, if relief were being awarded in money damages, without delivery of the boat, he would have been entitled to a sum equal to market value of a boat completed when and as promised (delivered to the Bahamas and with duty paid), plus other damages (items (4)–(6) and some indeterminate additional financing cost as approximated for item (7), part VIII, *supra*), less $66,616.77. If the parties had been agreeable to a transfer of the boat in its existing condition on May 29, 1981 (as later did occur after mid-June, 1981), it would have been appropriate to calculate the cash damages in precisely the same way but with a further deduction to the extent of the value of the boat in its incomplete condition. One permissible way of calculat-

ing that value, absent evidence of relevant market fluctuations, would be to take the agreed price of $186,616.77 as fairly representing value of the completed boat in the Bahamas, after delivery and payment of duty there, and deduct the cost of completion, delivery to the Bahamas and payment of duty—items (1)–(3), part VIII, *supra,* totaling $48,806.96. By this calculation, the value of the boat, incomplete as it was on May 29, 1981, was $137,809.81 ($186,616.77 minus $48,806.96). Thus, on the assumption of an agreed transfer of the boat in the condition it was in on May 29, 1981, Evans would have been entitled to damages calculated as follows:

| | |
|---|---|
| Value of boat as promised | $186,616.77 |
| Items (4)–(6) of added damages | 14,916.35 |
| Item (7) of added damages (assumed, for illustration, to be $4,000) [3] | 4,000.00 |
| | 205,533.12 |
| Less value of boat, incomplete | –137,809.81 |
| | 67,723.31 |
| Less final installment | – 66,616.77 |
| | $1,106.54 |

Thus, on the assumption stated as to item (7), the "face value" of Evans' legal claim against CSY because of CSY's breach was $1,106.54 in addition to the right to retain the final installment of $66,616.77—a total face value of $67,723.31. This is, of course, simply a restatement in different form of the total damages as itemized in part VIII, *supra,* with the amount of item (7) being assumed to be $4,000.

The practical value of the claim, however, was plainly less than the face value. Had Evans sought to enforce his claim through legal proceedings, his efforts would have been frustrated by bankruptcy, which was imminent on May 29, 1981 and became an accomplished fact within months—long before he could have obtained and enforced a judgment. The evidence does not disclose what percentage recovery he would have

---

**3.** As observed in part VIII, *supra,* the amount of this loss caused by CSY's breach was not claimed to be in its entirety a loss caused by Yegen's breach, and the evidence before me is insufficient to determine this loss precisely. An amount is assumed here for illustrative purposes. I find that the amount of loss determined to have been caused by Yegen's breach would not be different were the figure for item (7) a larger or smaller sum, within limits consistent with the evidence before me, than the $4,000 figure assumed here for illustrative purposes.

obtained through the bankruptcy proceedings. The evidence is sufficient, however, to make clear that on May 29, 1981, the highest value of Evans' claim was not the amount that could be obtained through court proceedings but instead the value that would be realized through a settlement arrangement closely analogous to that which was worked out between Evans and CSY in June, 1981. I find that had Yegen's breach not occurred, and had Yegen instead reported immediately to Evans the condition of the boat on May 29, 1981, Evans and CSY would have arrived at a settlement at substantially the same time as their mid-June understanding. That much is clearly established by the evidence in this case.

More difficult is the question what would have been the terms of the arrangement Evans and CSY would have made had Yegen's breach not occurred. Of course, Evans' claim at face value would have entitled him, if the boat was being surrendered to him, to receive it without making the final installment and indeed with a small additional cash payment from CSY. It is clear, however, that CSY would not have settled on this basis, and, of course, Evans could not obtain possession of the boat unless through legal proceedings (impractical for the reasons stated above) or settlement with CSY. I find that CSY's precarious financial condition, and the course of action it was pursuing, using all available means to obtain funds to meet its cash flow needs, would have led CSY to decline to surrender an unfinished boat of a value, even in unfinished state, in excess of $100,000, while receiving nothing in return beyond a release from further liability. Moreover, as a practical matter there was no way Evans could realize from his legally valid claim an amount equal to its full face value. Had he attempted to do so, the legal proceedings would have been unresolved when CSY went into bankruptcy, and Evans' eventual recovery would have been a fraction of the face value of the claim.

I find further that Evans' claim had more value for settlement than for processing through legal proceedings. That is, Evans could obtain a higher percentage of face value of the claim by negotiating a settlement with CSY than by pressing his claim to its full extent through legal proceedings. Thus CSY's hope of avoiding bankruptcy would have led it to make some concessions rather than insisting on the full final payment of $66,616.77, and Evans' hope of realizing a higher percentage of the face value of this legal claim against CSY would have led Evans to make some concessions rather than insisting on delivery of possession without any payment. I find also that it is reasonably certain that the form of settlement would have been delivery of the boat to Evans as it was on May 29, 1981, for a cash payment of part of the final installment, all other terms being exactly as they were in the agreement that Evans and CSY reached after Yegen's breach.

The remaining question to be determined is what the amount of that payment would have been. Of course, when finding what would have happened in circumstances contrary to those that in fact existed, one can never make a determination with precision and certainty. That difficulty is not unique to this case, however. It is characteristic of every but-for causation finding. Nor is it fatal to plaintiff's claim that, in this instance, the event that would have occurred is a settlement. When negotiating a settlement, parties and their representatives are likely to differ about the value of the claim, and one cannot say that any precise figure is the correct valuation. One may, however, reasonably estimate upper and lower limits. Indeed courts have long acted in a way closely analogous to this in determining that failure of a liability insurer to settle a tort claim was a basis for liability to its policyholder because the claim could have been settled for a figure low enough that it was negligence, or in violation of a duty of good faith, not to settle. *E.g., Attleboro Mfg. Co. v. Frankfort Marine, Accident & Plate Glass Ins. Co., supra,* 240 F. 573, 579–80 (claim of violation of duty of good faith); *Jenkins v. General Accident Fire & Life Assur. Corp.,* 349 Mass. 699, 702, 212 N.E.2d 464, 476 (1965) (duty of good faith); *Dumas v. Hartford Acc. & Indem.*

*Co.,* 94 N.H. 484, 56 A.2d 57 (1947) (negligence). See generally Annot., 40 A.L.R.2d [168], 178, 186–87 (1955).[4] On the evidence before me, I find that it is reasonably certain that settlement would have been effected between CSY and Evans by Evans' making a final payment of not less than $25,000 and not more than $40,000, and that $32,500 is the best estimate of the figure at which CSY and Evans would have settled. As a result of Yegen's breach, the final payment on Evans' behalf was $66,616.77 rather than $32,500. The difference between these figures, $34,116.77, is loss that Evans would not have sustained but for Yegen's breach.

 It may be argued that the proof is too speculative to support an award of damages in this amount. In this case, however, it is only the precise amount of loss that is difficult to determine. The fact of Yegen's breach, the fact that it caused substantial loss to Evans, and the way in which it caused that loss are all established with reasonable certainty. Moreover, Yegen's breach not only impaired an asset of Evans (his claim against CSY) but also made it impossible to determine the value of that asset with the degree of certainty that would have been possible had the breach not occurred. Where, as here, it is proved with reasonable certainty that the defendant's breach has caused substantial loss to the plaintiff and has also destroyed the means of proving precisely the amount of that loss, it is fair and reasonable to impose on the plaintiff less rigorous and demanding requirements as to the form of proof required to meet his burden of showing the amount.[5]

 Losses of the kind and to the extent that Yegen's breach caused in fact were also natural and probable consequences of the breach and within the contemplation of the parties at the time the Yegen-Evans supplemental agreement was made. A stated purpose of the agreement was to assure that the boat was ready for commissioning. Yegen entered into the agreement with knowledge that Evans planned to use the boat in the Bahamas charter service and had an interest in prompt performance of all of CSY's obligations in order to get the boat into service promptly. Moreover, it is common practice to withhold a final installment payment in order to serve as an incentive to full and prompt performance and as a means of enforcement. I conclude that judgment should be entered for Evans in the amount of $34,116.77, supported by each of the grounds of liability asserted in Counts I, II, and III.

## X.

 Section 11 of Chapter 93A permits the victim of an unfair or deceptive act to recover as follows:

If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two....

If the court finds in any action commenced hereunder, that there has been a

---

4. Another supporting analogy may be found in cases concerned with remedies for violation of a subrogee's rights in a tort claim. Like a subrogor who wrongfully took all the proceeds of a claim against a third party, here Yegen surrendered the final payment on Evans' behalf and in effect took all the corresponding benefits of doing so by adding to the Evans note, secured by a mortgage on the boat, an amount equal to the final payment. A subrogor who violates a subrogee's rights in a comparable way is accountable to the subrogee. *E.g., General Exch. Ins. Corp. v. Driscoll,* 315 Mass. 360, 52 N.E.2d 970 (1944) (quasi-contract theory).

5. See generally, *National Merchandising Corp. v. Leyden,* 370 Mass. 425, 430, 348 N.E.2d 771, 774 (1976) ("It is recognized that 'an element of uncertainty in the assessment of damages is not a bar to their recovery," see the H.D. Watts case on later appeal, 267 Mass. 541, 554, 166 N.E. 713 (1929); and that where, as here, 'the difficulties in determining damages arise in large part from [the defendant's conduct],' *Air Technology Corp. v. General Elec. Co.,* 347 Mass. 613, 627, 199 N.E.2d 538, 548 (1964), '[a] reasonable approximation will suffice.' *Ibid.*").

violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action. . . .

Since § 11 supplements but does not replace ordinary tort and contract remedies, see *Linthicum v. Archambault,* 379 Mass. 381, 398 N.E.2d 482 (1979), I find no reason to deviate from the traditional measure of "actual damages" as calculated in an action for deceit.

▮ I find also that in committing the breach and misrepresentation (see part VI *supra*), Yegen acted knowingly and willfully, motivated by the desire to avoid loss of the opportunity for making an advantageous 15-year loan, at 16.75% interest, which it could and did assign without recourse promptly. Thus, Evans has established a cause of action under Mass.Gen. Laws ch. 93A, § 11, and he is entitled at a minimum to double damages and attorneys' fees.

The remaining issue is whether a higher recovery, not exceeding treble damages, is appropriate in this case. Just as section 9 allows consumer victims to recover multiple damages, to effectuate the objectives of consumer protection, section 11 allows commercial victims to do so.[6] The present claim is that of a commercial victim, since the CSY-Evans contract and the Yegen-Evans contract and supplemental agreement were all made in contemplation of delivery of the boat into charter service in the Bahamas. The multiple damages provisions in sections 9 and 11 serve the same primary functions; they discourage businesses from knowingly engaging in deceptive trade practices by significantly increasing the magnitude of potential liability, and they encourage victims to avail themselves of these legal remedies, thus giving Chapter 93A greater practical effect.

Although the goals of the multiple damages provisions are similar in consumer and commercial victim actions, the considerations bearing on implementation may differ. As a practical matter, most commercial victims stand in a significantly stronger position than do consumers to avail themselves of legal remedies for deceptive trade practices. In the commercial context, therefore, double damages, when combined with compensation for attorneys' fees and costs, often may adequately serve the purposes of the multiple damages provision. For example, unlike the harm that occurs in many consumer transactions, the primary damages in this case are significant. Double recovery under these circumstances is both a deterrent to the recurrence of such deceptive practices and an adequate encouragement for future enforcement of Chapter 93A. In granting courts discretion to award damages of "up to three, but not less than two, times" the amount of actual damages, the Massachusetts legislature clearly contemplated something other than a mechanical calculation of multiple damages even when the defendants' conduct was willful or knowing. Exercising that discretion, I find that the purposes and goals of the multiple damages provision are best served in this case by an award of double damages.

On Count IV Evans is entitled to judgment in the amount of $68,233.54, together with interest, costs, and attorneys fees.

### XI.

Even though this case was well tried by counsel, the adversary system failed to function so as to serve the objective that the decisionmaker have the benefit of illumination of issues by arguments of counsel with respect to the matters considered in part IX of this opinion. Plaintiff argued that Yegen's breach was a cause of virtually all loss sustained by reason of delayed completion of the boat; defendant argued

---

**6.** Section 11 also parallels section 9 by allowing the defendant in a Chapter 93A action to escape liability for multiple damages by tendering a reasonable settlement offer. Unlike section 9, however, section 11 does not require the plaintiff to make a settlement demand on the defendant. Under section 9, defendant's bad faith rejection of such a demand is an independent basis for multiple damages.

that Evans failed to prove that he would not have suffered all this loss even if Yegen had violated no duty to Evans and that Yegen's breach was therefore not shown to be a cause of any of this loss. Neither of these positions is tenable. Rejecting both extremes, I have had to consider, without the benefit of advocacy, what part of the loss was caused by Yegen's breach. To redress this failure of the adversary system to function well in this instance, I will allow further submissions, within fifteen days, on the damages issues, before finally determining whether to order judgment based on the amount of damages stated in part IX.

Also, counsel are directed to confer in order to determine whether they can agree upon the amounts to be awarded as interest and attorneys' fees, and to report to the clerk within fifteen days. If agreement is not reached, a conference to consider procedures for resolving these issues will be scheduled.

Further submissions of the parties having been considered, the court made no modifications of part IX of the opinion of October 13, 1982. Although contesting the award of attorneys fees, defendant did not challenge the sum of $21,000 as the amount appropriate if fees were to be awarded. On January 12, 1983, judgment was entered for plaintiff in the amount of $101,236.79 (consisting of $68,233.54 damages, $9,085.23 interest, $2,918.02 costs, and $21,000 attorneys fees).

### ORDER

The court having determined, upon consideration of the additional submissions of the parties in response to Part XI of its previously filed opinion, that no modification of that opinion is appropriate, and it further appearing that defendant, though contesting the award of attorneys fees does not challenge the sum of $21,000 as the amount appropriate if fees are to be awarded, it is ORDERED:

Judgment will enter for plaintiff against the defendant Yegen Associates, Inc., in the amount of $68,233.54, together with interest from the date of commencement of this action to the date of entry of judgment, costs, and attorneys' fees in the amount of $21,000.