BUSHKIN ASSOCIATES, INC., & another[1] *vs.* RAYTHEON
COMPANY.

Suffolk.    September 12, 1984. — January 10, 1985.

Present: WILKINS, LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Conflict of Laws. Consumer Protection Act,* Exemption from liability, In-
terstate transaction.

Discussion of choice-of-law principles in actions for a broker's or finder's fee
    involving the State of New York. [628-634]
The validity of an oral agreement between a New York resident and a Mas-
    sachusetts based corporation for payment of a finder's fee, an agreement
    which was unenforceable under the Statute of Frauds of New York but
    enforceable under that of Massachusetts, was to be determined in ac-
    cordance with the law of Massachusetts. [634-636]
Telephone conversations between a New York investment banker and an
    officer of a Massachusetts based corporation respecting payment of a
    finder's fee were not transactions which occurred "primarily and substan-
    tially within the Commonwealth," and thus the Massachusetts corpora-
    tion was exempt under G. L. c. 93A, § 3 (1) (*b*), from the consumer
    protection claims made by the investment banker in an action against
    the corporation. [637-639]

CERTIFICATION of questions of law to the Supreme Judicial
Court by the United States Court of Appeals for the First
Circuit.

*Alan D. Rose (R. Reed Baer* with him) for the plaintiffs.
*Neal C. Tully (Dana C. Hanson* with him) for the defendant.

WILKINS, J. We deal with questions certified to us by the
United States Court of Appeals for the First Circuit, pursuant to
S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981). The
principal question involves a conflict of laws issue: whether the

---

[1] Merle J. Bushkin. We shall sometimes refer to the plaintiffs collectively
as Bushkin but intend to refer to Merle J. Bushkin himself when we describe
personal conduct.

Massachusetts or the New York Statute of Frauds should be applied in this action involving an alleged oral agreement between the plaintiff Bushkin, a New York resident, and his New York corporation, on the one hand, and the defendant Raytheon Company (Raytheon), a Massachusetts based corporation, on the other. An action based on such an oral agreement would be barred under the New York Statute of Frauds (N.Y. Gen. Oblig. Law § 5-701[a][10] [McKinney 1978 & Cum. Supp. 1984]), but would not be barred under the Massachusetts Statute of Frauds (G. L. c. 259, § 1).

The Court of Appeals understandably concluded that it was not "confident of the choice that would be made by the Supreme Judicial Court in this important case." Our cases have not indicated with any certainty how this court would resolve the choice-of-law question presented to us (nor indeed the other questions certified to us, which concern G. L. c. 93A).

The three questions certified are:

"1.  On the facts of this case, should New York or Massachusetts law determine the issue of validity of the alleged oral agreement between the parties?

"2.  Does Massachusetts General Laws chapter 93A apply to the allegations of deceptive acts and practices?

"3.  If the answer to question 2 is in the affirmative, is defendant entitled to the exemption of G. L. c. 93A, § 3 (1) (b) (i) in that the alleged actions forming the basis of the chapter 93A claim did not occur 'primarily and substantially' in Massachusetts?"[2]

The Court of Appeals appended to its certification "the summary of relevant facts as set forth by the district court in its opinion." We quote those facts in the paragraphs immediately hereafter.

---

[2] As to the third question, the Court of Appeals pointed out that the District Court did not reach it but that they added it "having in mind that the Supreme Judicial Court had only a limited opportunity to address the scope of 'primarily and substantially' in *Burnham* v. *Mark IV Homes, Inc.,* 387 Mass. 575, 580 (1982)."

*"Factual Background.*[a]

"Bushkin, a New York resident, is an investment banker specializing in mergers and acquisitions. He is the president of Bushkin Associates, a corporation organized and based in New York. Raytheon is a Delaware corporation with its principal place of business in Massachusetts.

"Bushkin's dealings with Raytheon concerning possible mergers and acquisitions began in 1971. In 1974, Bushkin discovered that Beech [Aircraft Corporation] might be available for acquisition. He attended a meeting in January, 1974, with Olive Ann Beech and Frank Hedrick, the president and vice president respectively of Beech, at which he learned some information regarding the type of merger that might interest them.[b]

"On May 21, 1974, Bushkin, in New York, telephoned Robert Seaman, a vice president of Raytheon, in Massachusetts, to ask if Raytheon would be interested in acquiring a general aviation company. Seaman replied that Raytheon might be interested if the company were either Cessna or Beech. Seaman followed up with a May 24 letter to Bushkin, stating that Raytheon's interest in a general aviation company was uncertain. During a July 19, 1974, telephone conference, Seaman told Bushkin that it was unlikely that Raytheon would have an interest in a general aviation company.

"The next conversation on the subject, and the one in which Bushkin alleges the oral fee agreement was made, occurred on January 28, 1975. Bushkin apparently telephoned Seaman (or Seaman returned Bushkin's call). In either event, Bushkin was in New York and Seaman in Boston. Bushkin asked if Raytheon were still interested in general aviation. Seaman

---

"[a]. Although Raytheon disputes many aspects of Bushkin's account of the facts relevant to this case, Raytheon is willing to, and indeed must, resolve any genuine disputes of fact in Bushkin's favor for the purposes of its motion for summary judgment. The following factual background, therefore, adopts Bushkin's version of any genuinely disputed facts."

"[b]. This meeting was arranged by Howard Suslak and Fred Schreier, principals of MacDonald & Co., Inc. MacDonald & Co. has an agreement with Bushkin whereby it will receive a share of any award Bushkin might recover from Raytheon."

replied yes, if the company were Beech or Cessna. Bushkin stated that he could reveal the name of the company, but first wanted to discuss a fee arrangement. Seaman told Bushkin that if Raytheon consummated an acquisition of the company Bushkin was discussing, Raytheon would pay a fee of one percent of the value of the transaction. Bushkin replied, 'fine,' and then identified the company as Beech.[c] He went on to disclose information as to his understanding of the kind of acquisition or merger that Beech wanted.

"Seaman and Bushkin had a few more contacts with regard to Beech and, on June 27, 1975, Seaman presented Beech as a possible acquisition candidate to Thomas Phillips, Raytheon's chairman of the board. An internal Raytheon 'acquisition log,' dated June 19, 1975, identifies Bushkin as the person who offered or suggested Beech as a candidate. On June 30, Seaman called Bushkin to report on the presentation, and to discuss various aspects of a possible Raytheon acquisition of Beech. Later that day, Seaman sent a memo to Phillips summarizing relevant aspects of his conversation with Bushkin.[d] In the memo, Bushkin was identified as 'our contact in this matter.'

"In a telephone conversation on July 29, 1975, Seaman told Bushkin that Raytheon had decided it was not interested in pursuing Beech as an acquisition candidate. Bushkin had subsequent contacts with Seaman and Phillips with regard to possible acquisition candidates other than Beech. On one occasion in November 1975 Bushkin broached the subject of Beech with Phillips (in the course of discussions about another candidate), and Phillips replied that he was not interested.

---

"[c]. The day before this conversation, Bushkin discussed Beech as a possible acquisition candidate, and allegedly entered into an oral fee agreement, with another company, Northwest Industries. After his conversation with Seaman, up until August 1979, Bushkin sought to interest several other companies in Beech."

"[d]. Bushkin told Seaman that Mrs. Beech was interested in a tax-free transaction, and dividend payouts to her and members of her family; that Beech was looking to develop a jet of its own; and believed that this kind of project could be better accomplished if it had the backing of a larger and financially stronger company; and that Beech wanted the Beech name to survive."

"On September 1, 1976, Raytheon entered into a written agreement with Lonsdale Enterprises, Inc., and its principals Royal Little and James Robison, for consulting services in connection with Raytheon's interest in mergers and acquisitions. About three months later, in letters to Phillips dated November 29 and December 9, 1976, Little and Robison suggested Beech as a possible acquisition candidate. Phillips' first reaction was not enthusiastic, but by February 16, 1977, Phillips indicated that he wanted to meet with Olive Beech. On February 28, while Bushkin was meeting with Phillips concerning another company, Bushkin again mentioned Beech, but Phillips said he was not interested. Nonetheless, on March 3, Phillips authorized Little and Robison to contact Beech through their business associate Angus MacDonald. In June, 1977, it became public knowledge that Beech was negotiating a merger with General Dynamics, and Raytheon, therefore, dropped the matter until those negotiations fell through.

"Phillips finally met with Frank Hedrick, vice president of Beech, on January 24, 1978, and with Olive Beech on July 12, 1978. After further negotiations and studies, Raytheon and Beech reached a preliminary agreement on October 1, 1979. Raytheon subsequently entered written agreements, dated November 26, 1979, to pay Lonsdale and MacDonald $600,000 and $500,000 respectively for their services in connection with the merger. The agreements were contingent on its consummation.

"In February, 1980, Raytheon acquired Beech. The value of the transaction was approximately $800,000,000.00."

The action came before the Court of Appeals on Bushkin's appeal following a Federal District Court judge's allowance of Raytheon's motion for summary judgment. In allowing that motion, the judge recognized that, in this diversity action, his obligation was to apply the choice-of-law rules of Massachusetts. *Klaxon Co.* v. *Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). He concluded that this court would not apply the principle that the choice of law would be governed by the place of contracting and concluded further that the principles stated in the Restatement (Second) of Conflict of Laws (1971)

were "not an effective means for resolving the choice of law problem in this case." In his view, "[d]etermining the projected scope of a law by application of an expanded interest analysis" helped to resolve the choice-of-law issue. Applying this analysis, he ruled that New York had a strong interest in protecting defendants against unfounded claims, even when New York brokers and finders sued non-New Yorkers. He said "Massachusetts, in contrast, has at most a minimal interest in applying its law to this case." He concluded that Bushkin could not avoid the laws of New York and should not benefit from forum shopping, and held that "[e]xpanded interest analysis clearly tips the scale in favor of applying New York law to the facts of this case."[3]

The judge further concluded that Bushkin's G. L. c. 93A claim merely restated his contract claim, believing that it was based solely on Raytheon's failure to abide by its agreement with Bushkin and its use, without payment, of information acquired pursuant to that agreement. Because the contract was unenforceable, it was his view that Bushkin's G. L. c. 93A claims must necessarily fail. He thus allowed Raytheon's motion for summary judgment and dismissed Bushkin's complaint.

We conclude that the alleged oral fee agreement is not barred by the New York Statute of Frauds because the law of Massachusetts determines the enforceability of the alleged oral agreement. We further decide that Raytheon is entitled to the exemption from G. L. c. 93A provided by G. L. c. 93A, § 3 (1) (*b*) (i), because Bushkin's G. L. c. 93A claim is not based on transactions and actions that occurred primarily in Massachusetts. We thus answer question three in the affirmative. Because Raytheon is exempt from liability under G. L. c. 93A, we need not answer question two, which inquires whether G. L. c. 93A applies to Bushkin's allegations of deceptive acts and practices.

---

[3] Neither party has suggested that the law of Kansas, the State in which Beech's operations were principally located, or the law of Delaware, the State of Raytheon's incorporation, are relevant to the choice-of-law question.

1. *On the facts of this case, should New York or Massachu-
setts law determine the issue of validity of the alleged oral
agreement between the parties?*

The plaintiff does not contend that his oral agreement would
be enforceable under the substantive law of New York. The
agreement would be held void under the New York Statute of
Frauds. N.Y. Gen. Oblig. Law § 5-701(a)(10) (McKinney
1978 & Cum. Supp. 1984). The protection of the New York
statute extends not only to residents, but also to "foreign prin-
cipals who utilize New York brokers or finders." *Intercontinen-
tal Planning, Ltd.* v. *Daystrom, Inc.,* 24 N.Y.2d 372, 383
(1969). According to the Court of Appeals "[i]t is common
knowledge that New York is a national and international center
for the purchase and sale of businesses and interests therein.
We conclude therefore that the Legislature in enacting subdivi-
sion 10 of former section 31 [now N.Y. Gen. Oblig. Law
§ 5-701(a)(10)] intended to protect not only its own residents,
but also those who come into New York and take advantage
of our position as an international clearing house and market
place. This is true because, of all the jurisdictions involved,
New York law affords the foreign principals the greatest degree
of protection against the unfounded claims of brokers and find-
ers. This encourages the use of New York brokers and finders
by foreign principals and contributes to the economic develop-
ment of our State. Our brokers and finders need only ensure
that their agreements for compensation comply with the Statute
of Frauds to receive the benefits of New York's position as a
business center." *Id.* at 383-384.[4]

[4] The court noted that the law was enacted in 1949 on the recommendation
of the Law Revision Commission which stated its reasons for proposing it.
"In recent years there have been a substantial number of reported cases of
claims for commissions for services rendered in the sale of a going business
or a business opportunity. Under existing law there is no requirement that
business brokers' contracts for commissions be in writing. The nature of
the transactions is such that, in the absence of the requirement of a writing,
unfounded and multiple claims for commissions are frequently asserted,
and employers often seek to escape liability by denying the fact of employ-
ment. These controversies are commonly resolved by juries on conflicting

It is also reasonably certain that, if this action had been commenced in New York, the New York courts under that State's choice-of-law rules would have looked to New York, and not to Massachusetts, substantive law. Decisions subsequent to the *Daystrom* case suggest that New York claims a paramount "interest" in applying its Statute of Frauds, even when defendants (like Raytheon) do not "come into New York." See *Pallavicini* v. *International Tel. & Tel. Corp.,* 41 A.D.2d 66, 69 (1973), aff'd, 34 N.Y.2d 913 (1974). See also *William J. Conlon & Sons* v. *Wanamaker,* 583 F. Supp. 212, 215-216 (E.D.N.Y. 1984); *O'Keeffe* v. *Bry,* 456 F. Supp. 822, 827-828 (S.D.N.Y. 1978).

Another court has given a broad reach to the New York Statute of Frauds. In *Denny* v. *American Tobacco Co.,* 308 F. Supp. 219 (N.D. Cal. 1970), the judge applied the "interest analysis" test used by California (see *Bernkrant* v. *Fowler,* 55 Cal. 2d 588 [1961]), and held that the New York Statute of Frauds barred a quantum meruit action brought by a California "finder" against a New York defendant demanding compensation for information contained in a letter concerning the possible sale of a California company. Although both the plaintiff and the acquired company were from California, he concluded that California's interest in protecting the reasonable expectations of its residents was much less apparent than New York's clear interest "in protecting its residents from just the sort of claim as is involved here." *Denny* v. *American Tobacco Co., supra* at 223. The judge also commented that California law followed neither the first nor the second Restatement of Conflict of Laws and noted that "[a] practitioner of the second Restatement would be hard put to say which of these states [California or New York] had 'the most significant relationship' with the 'contract' involved herein." *Id.* at 222. He concluded nevertheless that, under the second Restatement, New York law "might well be said to have the most significant contacts with the transaction here." *Id.* at 223.

testimony, with the consequent danger of erroneous verdicts. (1949 Report of N.Y. Law Rev. Comm['n] [N.Y. Legis. Doc., 1949, No. 65 (G)], p. 615.)" *Id.* at 383.

Courts in other jurisdictions, however, have rejected the Empire State's imperial reach. In three decisions applying the "most significant relationship" test, courts, faced with a defense of the New York Statute of Frauds pleaded against a New York plaintiff, have chosen forum and not New York law. See *Havenfield Corp.* v. *H & R Block, Inc.*, 509 F.2d 1263 (8th Cir.), cert. denied, 421 U.S. 999 (1975); *Ehrman* v. *Cook Elec. Co.*, 468 F. Supp. 98 (N.D. Ill. 1979); *Edwin F. Armstrong & Co.* v. *Ben Pearson, Inc.*, 294 F. Supp. 163 (E.D. Ark. 1967), aff'd sub nom. *Leisure Group, Inc.* v. *Edwin F. Armstrong & Co.*, 404 F.2d 610 (8th Cir. 1968). These cases are not directly on point because each case, but in varying degrees, presents "significant" contacts more strongly associated with the forum State than are the Massachusetts contacts in this case.

We surmise that the District Court judge in the case before us, by his reference to an expanded interest analysis, anticipated that we would adopt an approach to choice of law not unlike that of the California and New York courts. Of course, in the *Denny* case, the California Federal District Court applied New York law to protect a New York resident against a "finder" who "came into" New York. In our case, the question is whether the law of New York should be applied to protect a "resident" of Massachusetts from the claim of a New York broker or "finder."

The Court of Appeals and the District Court judge in this case were correct in concluding that this court would not permit the choice-of-law question to turn on where the contract was made. See *McKinney* v. *National Dairy Council*, 491 F. Supp. 1108, 1112 (D. Mass. 1980), to the same effect. See also *Emery Corp.* v. *Century Bancorp., Inc.*, 588 F. Supp. 15, 17 (D. Mass. 1984) (tort case); *Rudow* v. *Fogel*, 12 Mass. App. Ct. 430, 436-437 (1981) (New York law governs question of constructive trust of Massachusetts real estate). We rejected that simple rule in *Choate, Hall & Stewart* v. *SCA Servs., Inc.*, 378 Mass. 535, 540-541 (1979), and not solely for those cases in which reference to the law of the place of making would produce "awkward or arbitrary results." *Id*. at 541. Almost all

States have abandoned the lex loci rule (*id.*) and, as this case demonstrates, with good cause. Although for summary judgment purposes we must accept Bushkin's assertion that the contract was made in Massachusetts, the governing principles of law should hardly turn on a parsing of the disputed content of a telephone call or, more importantly, on the fortuitous fact that an oral offer was accepted orally in one State rather than in the other.

In our *Choate, Hall & Stewart* opinion, we noted that there were various doctrines that had replaced "one-factor tests with a more functional approach," but because of the particular facts of that case we were deprived "of an opportunity to elect among the extant doctrines." *Id.* at 541. In our opinions issued since the *Choate, Hall & Stewart* case, we have not dealt with choice-of-law questions in a contract case and, in the area of tort law, we have not elected by name any particular choice-of-law doctrine. See *Cohen* v. *McDonnell Douglas Corp.*, 389 Mass. 327, 333-337 (1983).

The facts of this case present us with the "opportunity" unavailable in the *Choate, Hall & Stewart* case. As with our tort cases, we decide here not to tie Massachusetts conflicts law to any specific choice-of-law doctrine, but seek instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole. Having surveyed the academic commentary and recent decisional law, we agree with Professor Leflar's perception that, despite the rhetoric of choice-of-law scholars, the courts and commentators "are arriving at results broadly consistent with each other's holdings." R.A. Leflar, American Conflicts Law § 99, at 198 (3d ed. 1977).

We, therefore, determine the choice-of-law question by assessing various choice-influencing considerations. It is, of course, obvious that, when courts turn to such considerations, they undertake to reach a fair result in a given case but may provide little guidance for anticipating the "fair result" in other cases. By considering a variety of factors and not simply, as some have argued, choosing the State with the greatest "interest" in the particular issue, some vagueness in the formula-

tions applied is probably unavoidable. Reese, The Second Restatement of Conflict of Laws Revisited, 34 Mercer L. Rev. 501, 518 (1983). Our approach, however, while producing less predictability, rejects artificial constructions. This, after all, was the primary reason for rejecting the traditional lex loci approach in favor of more modern methods. It makes little sense to reject one artificial approach only to replace it with another.

One obvious source of guidance is the Restatement (Second) of Conflict of Laws (1971). Under that Restatement, a choice-of-law question involving a Statute of Frauds is resolved according to the choice-of-law principles applicable to all substantive contract issues (§ 141). The principles contained in § 186 and § 187 provide that, in the absence of a choice of law by the parties, their rights "are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." *Id.* at § 188(1). "[T]he contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* at § 188(2). Factors under § 6 that are said to be relevant to the choice of the applicable rule of law include: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Id.* at § 6(2).

We do not view the process, intended under § 188, for determining the State with the most significant relationship to the issue as simply adding up various contacts. Each side has argued to us that the contacts with the State whose law it wishes

applied are greater in quantity.[5] Understandably they do not agree on which contacts are important or even relevant, such as events occurring after the date of the alleged contract.[6] In

---

[5] In support of his view that Massachusetts has the "more significant contacts," Bushkin points to the facts that (1) Raytheon has its principal place of business in Massachusetts, (2) Raytheon's corporate officers who dealt with Bushkin and worked out the merger with Beech lived and worked in Massachusetts, (3) Bushkin's offer of a fee agreement was orally accepted in Massachusetts, (4) information concerning Beech was delivered to Raytheon in Massachusetts, and (5) the place of performance (according to Bushkin) was Massachusetts. In turn, Bushkin argues that New York contacts "are almost absent."

Raytheon in turn points to the following contacts with New York: (1) Bushkin Associates, Inc., is a New York corporation with its sole place of business in New York, (2) Merle J. Bushkin is a resident of New York, (3) he learned of the availability of Beech from another New York broker, (4) Bushkin's contacts with Raytheon were initiated from New York, (5) Bushkin's services were performed in New York, (6) any loss Bushkin sustained occurred in New York, and (7) numerous aspects of the arrangement for the merger were carried out for Raytheon (and Beech) in New York, including the efforts of Raytheon's (and Beech's) legal counsel and investment bankers.

[6] The extent to which posttransaction events properly may be considered as decision-influencing contacts no doubt depends on the particular issue and the circumstances. R.A. Leflar, American Conflicts Law § 109, at 221 (3d ed. 1977). For the purpose of determining the constitutionality of choice-of-law decisions, a majority of the Supreme Court have viewed as acceptable a State's reliance on posttransaction events. *Allstate Ins. Co.* v. *Hague,* 449 U.S. 302, 319 (1981). Opinions involving the New York Statute of Frauds defense in broker's fee cases have considered events subsequent to the time of the fee agreement (*Ehrman* v. *Cook Elec. Co.,* 468 F. Supp. 98, 100 [N.D. Ill. 1979]; *Edwin F. Armstrong & Co.* v. *Ben Pearson, Inc.,* 294 F. Supp. 163, 167 [E.D. Ark. 1967], aff'd sub nom. *Leisure Group, Inc.* v. *Edwin F. Armstrong & Co.,* 404 F.2d 610 [8th Cir. 1968]), and one opinion explicitly recognized as relevant the circumstances of the making of the agreement between the broker's customer (the defendant) and the third party. See *Havenfield Corp.* v. *H & R Block, Inc.,* 509 F.2d 1263, 1268 (8th Cir.), cert. denied, 421 U.S. 999 (1975) ("it is the fact that the acquisition was consummated that gives rise to liability on the finder's fee contract, so the two contracts are very closely connected").

Reliance on posttransaction events, even ones not under the control of the parties, as an element in a choice-of-law decision injects an ambulatory quality into the issue that discourages certainty. Leflar, The Nature of Conflicts Law, 81 Colum. L. Rev. 1080, 1085 (1981). Particularly in a choice-of-law case involving the applicability of the Statute of Frauds, it seems appropriate "to give greater weight to contacts in existence at the time

any event, the contacts analyzed by themselves (without regard to § 6 principles) lead us neither to Massachusetts nor to New York as the State with the more significant relationship to the transaction or the parties. No simple and objective test can provide an acceptable choice-of-law answer in this case, nor should it.

We choose, instead, to emphasize the choice-influencing factors listed in § 6 (2) of the Restatement (Second) of Conflict of Laws, quoted above. Alternatively, we could consider the five considerations proposed by Professor Leflar in American Conflicts Law, *supra* at 195, on which we have previously relied. *Saharceski* v. *Marcure,* 373 Mass. 304, 312 n.7 (1977).[7] We agree with Professor Leflar that these five considerations generally parallel the considerations contained in longer lists, including § 6 (2) of the Second Restatement. R.A. Leflar, American Conflicts Law, *supra* at 194-195. We feel free, however, to borrow from any of the various lists to help focus our attention on the considerations particularly relevant to the case before us.

We begin by noting that the laws of both Massachusetts and New York favor the enforcement of contracts. The difference is that New York believes that the protection of defendants' rights requires that, in the circumstances of this case, there be a writing to prove the defendant's promise, while the law of Massachusetts does not (G. L. c. 259, § 1).[8] New York has

---

of contracting than to contacts which arise after that time." *McKinney* v. *National Dairy Council,* 491 F. Supp. 1108, 1114 (D. Mass. 1980). We think, for example, that the Statute of Frauds question should not be influenced by a postcontract decision by Raytheon and Beech to use professional advisors in New York rather than in Chicago, Boston, or Topeka to carry out the negotiations and closing of the transaction.

[7] These five factors are: "(A) Predictability of results; (B) Maintenance of interstate and international order; (C) Simplification of the judicial task; (D) Advancement of the forum's governmental interests; (E) Application of the better rule of law." R.A. Leflar, *supra* at 195.

[8] By St. 1984, c. 321, G. L. c. 259 was amended by adding § 7, which provides that a writing is required to enforce an agreement to pay compensation for services of the type Bushkin alleges he performed in this case. That statute has no direct application to this case. We do not view its enactment as having any significant bearing on the policy considerations that guide us to the answers in this case.

given focused attention to this question and its conscious adoption of a position on the question is obvious. *Intercontinental Planning, Ltd.* v. *Daystrom, Inc.,* 24 N.Y.2d 372, 383 (1969). However, one would hardly expect the Massachusetts Legislature to state affirmatively that no writing is required in the circumstances of an oral agreement to pay such a broker's or finder's fee when the Massachusetts Statute of Frauds already achieves that result. The choice by Massachusetts to permit a trier of fact to resolve conflicts in testimony, as is true in many cases involving large sums of money, is a policy that should be balanced against the policy of New York. We find, therefore, that the "relative interests [of New York and Massachusetts] in the determination of the particular issue" in this case, Restatement (Second), *supra* at § 6 (2) (c), point clearly toward neither State.

We find similarly that other important considerations, such as uniformity of result, maintenance of interstate order, and simplification of the judicial task, R.A. Leflar, American Conflicts Law, *supra* at 195, point toward neither Massachusetts nor New York. Uniformity and interstate order could be advanced only if all States accepted New York's extrajurisdictional reach, but other jurisdictions have not done so. See, e.g., *Havenfield Corp.* v. *H & R Block, Inc.,* 509 F.2d 1263 (8th Cir. 1975).

One significant consideration, the justified expectations of the parties, militates for Massachusetts law. Restatement (Second), *supra* at § 6 (2) (d); § 141, comment (g); § 188 comment (b); R.A. Leflar, American Conflicts Law, *supra* at § 103. Here Bushkin and Raytheon expected that any oral agreement would be enforced. Raytheon had made other, similar oral agreements to which it expected to be bound, including others with Bushkin. Since Bushkin is not in the business of supplying free information, we may assume he expected any agreement for such information to be enforced as well.

Finally, we note that, although the Statute of Frauds involves a question of substantive law and is not a procedural rule governed by the law of the forum (but see *Emery* v. *Burbank,* 163 Mass. 326, 329 [1895]), the Statute of Frauds concerns the

necessary proof of a case and not the substantive merits of a plaintiff's claim. Cf. Twerski & Mayer, Toward a Pragmatic Solution of Choice-of-Law Problems — At the Interface of Substance and Procedure, 74 Nw. U.L. Rev. 781, 784-786 (1979). Where relevant contacts and considerations are balanced, or nearly so, we are inclined to resolve the choice by choosing that law "which would carry out and validate the transaction in accordance with intention, in preference to a law that would tend to defeat it" (footnotes omitted). *Boston Safe Deposit & Trust Co.* v. *Paris,* 15 Mass. App. Ct. 686, 691 (1983). In this case, the law that will validate the agreement, if indeed there was an agreement, is that of Massachusetts.

In answer to the first question, we conclude that the law of Massachusetts should determine the issue of the validity of the alleged oral agreement between the parties.

2. *Does Massachusetts General Laws chapter 93A apply to the allegations of deceptive acts and practices?*

We construe question two as inquiring about the extent to which, apart from any exemption, G. L. c. 93A applies to allegedly unfair or deceptive acts or practices of the sort alleged in this interstate transaction.[9] Because we conclude in our answer to the third question that Raytheon is exempt from Bushkin's G. L. c. 93A claim, we need not answer the question.

---

[9] Although it urges us to answer the second question in the negative, Raytheon makes no argument in its brief that, if the New York Statute of Frauds does not apply to this case, G. L. c. 93A does not apply to the alleged unfair or deceptive acts or practices on which Bushkin relies. It argues, however, that it is exempt from G. L. c. 93A, an issue presented in the third question.

3. *If the answer to question 2 is in the affirmative, is defend-
   ant entitled to the exemption of G. L. c. 93A, § 3 (1) (b) (i)
   in that the alleged actions forming the basis of the chapter
   93A claim did not occur "primarily and substantially" in
   Massachusetts?*

Under G. L. c. 93A, § 3 (1) (*b*), as amended by St. 1969,
c. 814, § 2,[10] Raytheon is exempt from Bushkin's G. L. c. 93A
claim unless that claim involved "transactions and actions
which (*i*) occur[red] primarily and substantially within the com-
monwealth." This exemption represents a legislative determi-
nation that G. L. c. 93A should not apply to certain transactions
and actions that do not occur principally and significantly in
Massachusetts. This court has had little occasion to consider
the scope of the exemption. In *Burnham* v. *Mark IV Homes,
Inc.,* 387 Mass. 575, 580 (1982), we noted that the facts of
the case did "not require us to define the outer boundaries of
those transactions and actions which may be held to have
occurred primarily and substantially within the Common-
wealth." Federal cases have involved this general issue, but
on the facts the various judges have been able to determine
with relative ease whether particular actions and transactions
occurred primarily and substantially in Massachusetts or else-
where.[11]

---

[10] "Section 3 (1). Nothing in this chapter shall apply to . . . (*b*) trade or
commerce of any person of whose gross revenue at least twenty per cent
is derived from 'transactions in interstate commerce, excepting however
transactions and actions which (*i*) occur primarily and substantially within
the commonwealth, and (*ii*) as to which the Federal Trade Commission or
its designated representative has failed to assert in writing within fourteen
days of notice to it and to said person by the attorney general its objection
to action proposed by him and set forth in said notice."

By St. 1983, c. 242, the exemption provided by § 3 and involved in this
question was eliminated. The events involved in the G. L. c. 93A claim
occurred in 1975.

[11] See *Computer Syss. Eng'g, Inc.* v. *Qantel Corp.,* 571 F. Supp. 1365,
1371-1372 (D. Mass. 1983), aff'd, 740 F.2d 59 (1st Cir. 1984); *Evans* v.
*Yegen Assocs.,* 556 F. Supp. 1219, 1228 (D. Mass. 1982); *Turner* v.
*Johnson & Johnson,* 549 F. Supp. 807, 813 (D. Mass. 1982); *American
Hosp. Supply Corp.* v. *Roy Lapidus, Inc.,* 493 F. Supp. 1076, 1078 (D. Mass.

Bushkin's G. L. c. 93A claim is based on alleged representations made during a telephone call or calls in 1975 between a Raytheon officer in Massachusetts and Bushkin in New York. Bushkin asserts that Raytheon's officer obtained information from Bushkin concerning Beech by falsely representing that Raytheon would pay for Bushkin's services.[12] Bushkin in New York then relied on those representations and from New York disclosed the name of Beech and provided information about Beech. Thereafter, Bushkin alleges he sustained a loss.

Raytheon has met its burden of showing that the transactions and actions on which Bushkin relies did not occur primarily in Massachusetts. G. L. c. 93A, § 3 (2). The telephone conversations were between New York and Massachusetts. The alleged unfair or deceptive acts or practices were statements made in Massachusetts but received and acted on in New York. Any loss was incurred in New York.

If it were proper (and we need not decide the point)[13] to engage in a broader analysis of this issue, similar to the func-

---

1980); *Boston Super Tools, Inc.* v. *RW Technologies, Inc.,* 467 F. Supp. 558, 562 (D. Mass. 1979); *U.S. Broadcasting Co.* v. *National Broadcasting Co.,* 439 F. Supp. 8, 11 (D. Mass. 1977).

Only two of these opinions involved any discussion of the circumstances leading to the judges' conclusions. In the *Evans* case, the judge ruled that, while unfair and deceptive acts took place both in Florida and in Massachusetts, the communication of the misrepresentation occurred while the defendant's agent was speaking with the plaintiff in Massachusetts. 556 F. Supp. at 1228. The court ruled, therefore, that "more" of the transactions occurred in Massachusetts than elsewhere, "thus satisfying the requirement that they 'occur primarily and substantially within this [*sic*] commonwealth.'" *Id.* In the *Qantel* case, the analysis was similar, with the judge finding that the actual misrepresentations occurred "mainly" while the defendant's agents were in Massachusetts. 571 F. Supp. at 1372. The court ruled that "Qantel has failed to meet its burden of proving an exemption under § 3." *Id.*

There is no legislative history that serves as an aid to the construction of G. L. c. 93A, § 3 (1) (*b*) (*i*).

[12] Bushkin disclaims any G. L. c. 93A violation on Raytheon's refusal to honor a contract. Other allegations of Raytheon's unfair or deceptive acts or practices suggested by Bushkin cannot have caused Bushkin any loss of money or property. See G. L. c. 93A, § 11.

[13] See *Burnham* v. *Mark IV Homes, Inc.,* 387 Mass. 575, 580 n.9 (1982).

tional approach we used to decide the choice-of-law question in this action, the result would be the same. The significant contacts in this action are approximately in balance (see note 5 above) and thus show no primary involvement with Massachusetts. Further, the choice-influencing factors on which we relied to answer the first question (expectations of the parties and the presumption of a contract's validity) are not relevant to the G. L. c. 93A claim and provide no basis for resolving this third question.

We therefore answer Question three in the affirmative.

4. Our answer to the first question is that the law of Massachusetts should determine the issue of the validity of the alleged oral agreement between the parties. We answer the third question in the affirmative, and thus need not answer the second question.