**In re MORSE TOOL, INC., Debtor.**

**David FERRARI, Trustee of Morse Tool, Inc., Plaintiff,**

**v.**

**BARCLAYS BUSINESS CREDIT, INC., Defendant.**

**Bankruptcy No. 87–10588–CJK.**
**Adv. No. 87–1303–CJK.**

United States Bankruptcy Court, D. Massachusetts.

Dec. 22, 1989.

See also, Bkrtcy., 87 B.R. 745.

Gene Landy, Mark Berman, Boston, Mass., for trustee.

Charles Bennett, Boston, Mass., for Barclays Business Credit, Inc.

Memorandum of Law on Plaintiff's Motion for Partial Summary Judgment Regarding Choice-of-Law

CAROL J. KENNER, Bankruptcy Judge.

The Trustee and Barclays have filed cross-motions for summary judgment as to which state's law should govern the Trust-

ee's fraudulent conveyance claim. The Trustee brings that claim pursuant to his power under 11 U.S.C. § 544(b) to avoid transfers and obligations that are voidable under "applicable law," which the Trustee claims is Massachusetts law and Barclays claims is Connecticut law. In order to settle this dispute, a bankruptcy court would normally first determine whose choice-of-law rules to apply: its own (the "federal common law") or those of the state in which it sits. But the matter is not settled [1] and need not be settled to resolve this dispute. Whether the Court applies the federal common law or the law of Massachusetts, the result will be the same: it will apply the "multiple-factor, 'interest analysis' or 'most significant relationship' analysis exemplified by the *Restatement (Second) of Conflict of Laws (1971)." Bi-Rite Enterprises, Inc. v. Bruce Miner Co., Inc.,*

757 F.2d 440, at 442–443 (1st Cir.1985) (characterizing the analysis employed in recent Massachusetts choice-of-law cases).[2]

Under the approach of the second Restatement, the Court must apply the law of the state that has the most significant relationship to the parties, the transfer, and the issue. Courts are to determine which state has the most significant relationship to an issue [3] by evaluating the significance of various contacts according to certain choice-influencing considerations:

(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictabili-

1. Some courts, following *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("there is no federal general common law," *id.* at 78, 58 S.Ct. at 822; "except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State," *id.*) and *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (A federal court sitting in diversity must follow the conflict-of-laws rules of the state in which it sits.), hold that a federal court exercising bankruptcy jurisdiction must follow the conflict-of-laws rules of the state in which it sits. See *In re Medico Associates, Inc.,* 23 B.R. 295, 301–302 (Bankr.D. Mass.1980); *In re O.P.M. Leasing Services, Inc.,* 40 B.R. 380, 391–392 (Bankr.S.D.N.Y.1984). Other courts, following *dicta* in *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 161–162, 67 S.Ct. 237, 239–240, 91 L.Ed. 162 (1946) (A bankruptcy court should determine which state's law to apply in claims litigation by exercising "an informed judgment in the balancing of the interest of all the states with the most significant contacts in order to best accommodate the equities among the parties to the policies of those states," *id.* at 162, 67 S.Ct. at 239), hold that a bankruptcy court must apply the federal common law choice-of-law rules. See, for example, *In re Holiday Airlines Corp.,* 620 F.2d 731, 733–734 (9th Cir.1980) and *In re McCorhill Publishing, Inc.,* 86 B.R. 783, 792 (Bankr.S.D.N.Y.1988) and cases cited therein.

2. The Massachusetts cases employing this kind of analysis are *Pevoski v. Pevoski,* 371 Mass. 358, 358 N.E.2d 416 (1976); *Choate, Hall & Stewart v. SCA Services, Inc.,* 378 Mass. 535, 540–541, 392 N.E.2d 1045 (1979); and especially *Bushkin Associates, Inc. v. Raytheon Co.,* 393 Mass. 622,

628–636, 473 N.E.2d 662 (1985). See also the application of Massachusetts choice-of-law principles in *Computer Systems of America v. International Business Machines Corp.,* 795 F.2d 1086, 1091–1092 (1st Cir.1986) and *Bi-Rite Enterprises v. Bruce Miner Co., Inc.,* 757 F.2d 440, 443–446 (1st Cir.1985).

For cases in which courts, applying the federal common law, adopt the "most significant relationship" approach of the *Restatement (Second) of Conflict of Laws,* see *Harris v. Polskie Linie Lotnicze,* 820 F.2d 1000, 1003–1004 (9th Cir.1987); *In re McCorhill Publishing, Inc.,* 86 B.R. 783, 792 (Bankr.S.D.N.Y.1988); and *In re Kaiser Steel Corp.,* 87 B.R. 154, 157–158 (Bankr. D.Colo.1988).

This Court has found no cases in which the Massachusetts courts or the federal courts (applying federal common law) have applied the "most significant relationship" approach to a fraudulent conveyance action. But see *In re Kaiser Steel Corp.,* 87 B.R. at 157–160, in which a bankruptcy court, in a fraudulent conveyance action to which it applied the forum state's (Colorado's) "most significant relationship" approach, stated that this approach was similar to that which the court would have employed had it applied the federal common law on the choice-of-law issue.

3. As the Massachusetts Supreme Judicial Court has stated, this analysis should not be construed as simply choosing the state with the greatest 'interest' in, *Bushkin Associates, Inc. v. Raytheon Co.,* 393 Mass. 622, 631, 473 N.E.2d 662 (1985), or the greatest number of contacts with, *id.* at 632, 473 N.E.2d 662, a particular issue. Rather, the process is one of weighing each contact according to its relevance or significance.

ty and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws (1971) at § 6(2). See *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631–634, 473 N.E.2d 662 (1985).

This case has significant contacts with four states—Massachusetts, Michigan, New York, and Connecticut. The first three have adopted the Uniform Fraudulent Conveyance Act (UFCA) [4]; Connecticut has not, but instead provides a remedy for fraudulent conveyances in the form of Connecticut General Statutes, § 52–552.

Connecticut has two contacts with this case. The first is its contact with Barclays: Barclays is incorporated and conducts its business in Connecticut. The second is its contact with the allegedly fraudulent security agreement: Barclays and Morse Tool, Inc. agreed in their General Loan and Security Agreement of August 24, 1984, that Connecticut law would govern "this agreement and all transactions, assignments and transfers hereunder, and all the rights of all the parties" with respect to "validity, construction, enforcement and in all other respect." General Loan and Security Agreement, par. 23. It is on this latter contact—the contractual choice-of-law clause—that Barclays bases its argument that Connecticut law should govern.

▓▓ The choice-of-law clause carries little weight in the context of this adversary proceeding. The parties to a contract can specify which forum's law will govern their contract, and courts often follow their choice because both parties to the contract, and therefore to the suit on the contract, have agreed upon the choice. But this is a fraudulent conveyance action, not a contract action. And one of the parties to this suit—the Trustee, who stands in the shoes of the creditors—was not a party to the contract. The parties to a contractual conveyance cannot in their contract make a choice-of-law that binds creditors who allege that they were defrauded by the conveyance. The choice-of-law binds only parties to the contract, not the Trustee or the creditors.

Neither the *Restatement (Second) of Conflict of Laws* (1971) nor *Desmond v. Moffie*, 375 F.2d 742 (1st Cir.1967) requires a different result. Section 187 of the *Restatement* states that, under certain circumstances, "[t]he law of the state *chosen by the parties* to govern their contractual rights and duties will be applied." *Restatement (Second)*, § 187(1) and (2) (emphasis added). This section, on which Barclays relies, plainly applies only to suits between parties to a contract regarding their rights and duties under the contract. And it applies only where the parties to the suit have chosen which state's law will govern. Neither of these circumstances applies here.

Nonetheless, citing *Desmond v. Moffie, supra,* Barclays contends that a fraudulent conveyance action sounds in contract. *Desmond* does not stand for that proposition. It holds that for purposes of deciding which statute of limitations the Massachusetts courts would apply to a fraudulent conveyance action, the fraudulent conveyance action should be treated as a contract action, not as a tort action, because its essential basis is an indebtedness. *Desmond v. Moffie*, 375 F.2d at 743–744. This holding does not require that the courts treat fraudulent conveyance actions as sounding in contract for choice-of-law purposes. For statute of limitations purposes, the fraudulent conveyance had to be categorized as either a tort or a contract; there was no middle ground because the Commonwealth had no statute of limitations applying specifically to fraudulent conveyances. The choice-of-law rules, on the other hand, permit more flexibility. In fact, they require the court to consider, among other things, "the basic policies underlying the *particular* field of law." *Restatement (Second)*, § 6(2)(f) (emphasis added).

A fraudulent conveyance action is not easily categorized. It usually, if not al-

---

**4.** For Massachusetts law, see G.L. c. 109A, §§ 1 to 13; for Michigan law, see M.C.L.A. §§ 566.11 to 566.23; and for New York law, see McKinney's Debtor and Creditor Law, §§ 270 to 281.

ways, arises as an ancillary action to a suit on a debt. The debt can be and often is contractual, but it can also derive from any number of other sources, such as from a tort or property judgment or from a tax statute.[5] Therefore, the underlying basis of a fraudulent conveyance suit varies and is not necessarily contractual.

Accordingly, the focus here should be not so much on the debt to which the fraudulent conveyance action is ancillary as on the fraudulent conveyance action itself. A fraudulent conveyance action is one in which creditors seek to avoid a conveyance of assets from the debtor to a transferee. The crucial parties in the suit, the creditors and the transferee, usually have not dealt directly with each other. The only things that they have in common are dealings with the same debtor and claims of entitlement to certain asset of that debtor. From these observations follow two conclusions.

■ First, a fraudulent conveyance suit is not a suit on a contract. The conveyance sometimes occurs pursuant to a contract, as did the alleged fraudulent conveyance in this case, but it need not. And even when it does, the contract is not between the parties to the suit, but between two parties whom the plaintiff (a creditor or a bankruptcy trustee) alleges executed the contract for the very purpose of defrauding creditors. In view of this, it makes no sense to follow the choice-of-law clause in the agreement between Barclays and the Debtor. That would be tantamount to giving the defendant unilateral control over the choice-of-law, which clearly would violate the requirements of due process.

■ Second, because the creditors and the transferee have had no direct dealings with each other, but have both dealt with the debtor and the debtor's assets,[6] it would be reasonable to look to the site of

the (allegedly) fraudulently conveyed assets to supply the applicable law. This would promote certainty, predictability, and the protection of justified expectations. The creditors of Morse Tool would have had little cause to suspect that the collectability of their claims would be subject to the law of Connecticut because Morse Tool had no assets or operations there. Likewise, Barclays would have had little cause to suspect that its security interest would be subject to the fraudulent conveyance law of any one of the various jurisdictions in which Morse Tool's creditors are located. Both would have been justified in looking to the law of the state in which the Debtor and its assets were located, simply because the Debtor and especially the transferred assets are the known common foci in a fraudulent conveyance action.

Although the site of the conveyed property will not always and necessarily be the state with the most significant relationship to a fraudulent conveyance action, it often will be, just by the nature of the cause of action. The authorities accordingly have shown a preference for applying the law of the site of the conveyed property. See 4 Collier on Bankruptcy par. 544.02, at 544–13 to 544–14 and fn. 17 (15th ed. 1989) ("The tendency of the courts is to treat the law of the site of property at the commencement of the case as governing to the extent that § 544(a) refers to non-bankruptcy law." *Id.*) and cases cited therein; *In re Kaiser Steel Corporation*, 87 B.R. 154 (Bankr.D.Colo.1988) ("Under Section 244 [of the *Restatement (Second) of Conflicts*], the law of the courts of the site of the property will usually apply to resolve questions of fraud and the validity of the conveyance at issue." *Id.* at 159). See also Uniform Commercial Code § 9–103(1)(b) (adopted in both Connecticut and Massachusetts) (The law of the site of the property governs the perfection and

---

**5.** In the Morse Tool bankruptcy, the Trustee brings his fraudulent conveyance suit on behalf of creditors as an ancillary action to the creditors' claims against the estate, most of which arise from contracts with the debtor, but many

of which arise from tax and employment-related statutes and other sources.

**6.** The premise of fraudulent conveyance law is that a creditor is entitled to rely on the debtor's

effect of perfection of a security interest.).[7]

In this case, the transferred assets were the Debtor's inventory and accounts receivable. At all times relevant to this action, the great majority of the inventory was located in New Bedford, Massachusetts. The remainder was located at the Debtor's plant in Elk Rapids, Michigan. The accounts receivable, being intangible items, had no physical location. For choice-of-law purposes, the Uniform Commercial Code treats "accounts" and "general intangibles" as being present in the jurisdiction where the debtor is located, § 9–103(3)(b); and if the debtor has more than one place of business, the debtor is deemed to be located at the place of its chief executive offices, § 9–103(3)(d).[8] Therefore, the location of the property in this case is both Massachusetts and Michigan, as between which there is no conflict of law. Michigan would apply the same law as would Massachusetts, the UFCA.

Therefore, the application of Massachusetts law would comport with the basic policies underlying fraudulent conveyance law in that a fraudulent conveyance suit is typically a suit between strangers who have in common only that they both have dealt with the debtor and its assets. The application of Massachusetts law would also comport with the principles of certainty, predictability and the protection of justified expectations because Massachusetts and Michigan, both of whom would apply the UFCA, are the only states whose law the creditors and Barclays could both have expected to govern here.

Finally, applying Massachusetts law is further justified because Massachusetts law is the same as that of the states that together have the great majority of the significant relationships to this action. Massachusetts, Michigan, and New York would apply the UFCA; only Connecticut would not. Massachusetts was the location of the majority of the Debtor's manufacturing operations (responsible for over 80% of the debtor's production), employees (a significant portion of the debt in this case is employee-related), inventory and other assets (approximately 75%), and is the state with the largest concentration (both in number and in amount owed) of the Debtor's creditors. Michigan was where the Debtor was incorporated and headquartered and had the remainder of its manufacturing operations and assets. New York was where the allegedly fraudulent conveyance was executed and where G & W, the third-party to the "leveraged buy-out" transaction of August 24, 1984, was headquartered. Connecticut's sole relation to this action is as Barclays' state of incorporation and place of business.

From this brief survey the Court concludes that, although no one state holds a majority of the significant contacts, Massachusetts comes closest of the four states to doing so. And when Massachusetts' contacts are added to those of the two other UFCA states, the balance clearly weighs in favor of applying the UFCA, not Connecticut law. Therefore, I conclude that the basic policies underlying fraudulent conveyance law *Restatement (Second)*, § 6(2)(e); the promotion of certainty and predictability, *id.* § 6(2)(f); the protection of justified expectations, *id.* § 6(2)(d); and the relevant policies of the interested states, *id.* § 6(2)(c) require that Massachusetts law govern the Trustee's fraudulent conveyance claim. On this issue, the Trustee is entitled to judgment as a matter of law.

A separate order will enter accordingly.

---

equity in certain assets as a potential means of satisfying its debt.

**7.** The Uniform Commercial Code does not govern a fraudulent conveyance claim, but its choice-of-law rules which have been widely adopted, are meant to apply to issues similar to fraudulent conveyance issues. That is, fraudu-

lent conveyance law and the law governing the perfection of security interests both deal with the effect of a transfer of an interest in property on a third-party.

**8.** See note 7 above.