van Gestel, Allan, J.
This matter is before the Court, pursuant to Mass.R.Civ.P. Rule 12(b)(6), on the defendant, Deioitte & Touche, LLP’s Motion, to Dismiss, Paper #11.
When discussing its own duties regarding a motion to dismiss, the Supreme Judicial Court has reminded this Court that:
The standard of review for a motion to dismiss pursuant to Rule 12(b)(6) is well settled. We take as true “ ‘the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiffs favor . . .’ Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). In evaluating the allowance of a motion to dismiss, we are guided by the principle that a complaint is sufficient ‘unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.’ Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).” Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998). Although errors of law based on the facts alleged will not surmount a rule 12(b)(6) challenge, the plaintiffs burden is “relatively light.” Id., citing Gibbs Ford, Inc. v. United Truck Leasing Corp., 399 Mass. 8, 13 (1987).
Marram v. Kobrick Offshore Funds, Ltd., 442 Mass. 43, 45 (2004).
*678 “[A] complaint is sufficient if it ‘sketch(es) the bare silhouette of a cause of action.’ ’’ Stevens v. Nigel, 64 Mass.App.Ct. 136, 140 (2005).
It is with this charge from the Massachusetts appellate courts, that this Court reviews the four corners of the Complaint and the reasonable inferences that can be drawn from the factual allegations therein searching for the requisite silhouette.

BACKGROUND

The facts sketched hereafter are taken solely from the Complaint. The Complaint contains three counts: Count I is for negligent misrepresentation; Count II is for conspiracy to commit fraud; and Count III is for aiding and abetting fraud.
The plaintiff, Bank of America, N.A. (“BoA”), as a successor by merger to Fleet National Bank (“Fleet”), the latter acting as an agent for a syndicate of lenders, basically charges that Deloitte & Touche, LLP (“Deloitte”), as auditors for DVI Financial Services, Inc. (“DVIFS”), a wholly owned subsidiary of DVI, Inc. (“DVTj, failed to detect “a massive wire and mail fraud scheme intended to conceal DVTs dire financial condition from . . . Fleet.”[1] For the years 1999-2002, Deloitte, as DVI’s independent auditors issued audited Financial Statements provided by DVI that included, without qualification, the following statements: “In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of DVI, Inc. and its subsidiaries,” and “that the results of their operations and their cash flows” for the years then ended are “in conformity with accounting principles generally accepted in the United States of America.”
DVI and its subsidiaries, including DVIFS, filed joint petitions for bankruptcy protection under Chapter 11 on August 25, 2003, in the District of Delaware. The cases are captioned In re: DVI, Inc., DVI Financial Services, Inc. and DVI Business Credit Corporation, Case No. 03-12656 through Case No. 03-12658.
The Delaware Bankruptcy Court “appointed an independent Chapter 11 examiner to investigate DVI’s financial transactions, accounting practices, allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, financial and/or corporate irregularities and potential claims of debtors against current and former officers and directors.” The Examiner’s entire 188-page Report to the Bankruptcy Court is attached to and made a part of the Complaint in this action. Included in the Executive Summary of the Examiner’s Report, in the final two paragraphs on p. 16, is the following;
Given the potentially substantial harm, DVI apparently proposed to Deloitte that it would be willing to records losses and make other adjustments with respect to the relevant transactions, so as to facilitate the 10-Q filing; nonetheless, Deloitte categorically rejected this proposal. Thus, Deloitte basically left DVI at the eleventh hour with no viable choice but to file the Form 10-Q without Deloitte’s approval. Deloitte’s actions (or inactions) may or may not have risen to the level of negligence or technically constituted breaches of its duties to DVI. (The Examiner believes it premature to take a position on whether any claims or causes of action exist against Deloitte.) However, in the Examiner’s opinion, Deloitte’s conduct aggravated the circumstances leading to DVI’s present situation, and the Examiner finds Deloitte’s actions to be inexplicably contradictory.
Upon the resignation of Deloitte, the light of public scrutiny began to intensify and DVI collapsed amidst allegations of irregularities and mismanagement, many of which, unfortunately, have basis in fact as discussed in this Report.
DVIFS borrowed money from the Fleet syndicate pursuant to a series of loan agreements (the “Credit Agreement”). The loans extended to DVIFS pursuant to the Credit Agreement were guaranteed by DVI. The amount of credit Fleet extended to DVIFS pursuant to the Credit Agreement was based on a borrowing base formula that allowed DVIFS to borrow against the value of certain of DVIFS’s contract receivables that met specific eligibility requirements. The Credit Agreement required that DVIFS provide Fleet with periodic “Borrowing Base Reports” detailing the total dollar amounts of eligible contracts.
During the relevant time period, Fleet extended credit to DVIFS in varying amounts up to and including $150 million, the total amount available under the Credit Agreement.
Pursuant to the Credit Agreement, DVIFS was required to provide Fleet with annual consolidated financial statements for DVI audited by Deloitte; annual unaudited consolidating financial statements for DVI and its subsidiaries; DVI’s SEC Form 10-K; quarterly financial statements for DVI and its subsidiaries accompanied by a detailed Compliance Certificate; and DVI’s SEC Form 10-Q, all of which were approved and reviewed by Deloitte in its capacity as DVTs auditor and independent public accountant.
Fleet, in making decisions about whether to extend credit to DVIFS, relied on the fact that all of DVI’s audited financial statements, as well as DVI’s SEC filings and quarterly financial statements, had been reviewed and approved by Deloitte.
Among other allegations, Paragraph 37 of the Complaint reads:
In the course of its business, Deloitte audited DVI’s 1999-2002 Financial Statements, and reviewed and approved DVI’s Quarterly Financial Statements, accompanying compliance certificates, and Forms 10-K and 10-Q. At all relevant times, Deloitte intended to supply these materials to DVI and its subsidiaries for the benefit and guidance of a lim *679 ited group of persons that included Fleet. Deloitte knew or should have known that DVI and its subsidiaries intended to supply these materials to Fleet for its benefit and guidance. At all relevant times, Fleet relied on the representations contained in these materials. Deloitte knew and/or intended that DVI would provide these materials to Fleet to influence Fleet’s decision to extend credit to DVIFS.
Paragraph 38 of the complaint charges that “The 1999-2002 Financial Statements, Quarterly Financial Statements, accompanying compliance certificates, and Forms 10-K and 10-Q were materially false and misleading and materially misrepresented the true financial condition of DVI and its subsidiaries.”
Because Deloitte has raised an issue regarding the choice of law that should be applied to the three counts of the Complaint, the Court here summarizes the factual allegations in the Complaint relating thereto.
Fleet, at the material times, was based in Boston, Massachusetts. None of the other banks or lending entities in the lending syndicate were based in Massachusetts. They included: U.S. Bank National Association, located in Minneapolis, Minnesota; J.P. Morgan Chase, N.A., located in Columbus, Ohio, a successor by merger to Bank One, N.A., formerly located in Chicago, Illinois; Sovereign Bank, located in Pennsylvania; and IXIS Real Estate Capital, Inc., located in New York, a successor by merger to CDC Mortgage Capital, Inc., also located in New York.
Although Deloitte maintains an office in Boston, the auditing team handling DVI and its subsidiaries was based principally out of Deloitte’s Princeton, New Jersey office, and did most of its work on-site at DVI’s place of business in Jamison, Pennsylvania. The Examiner, in his report, observes that “in conducting its audits and performing other services for DVI, Deloitte worked very closely and extensively with DVI” and “Deloitte set up site at DVI’s offices, and instituted quarterly reviews which were basically quarterly audits of DVI, with particular focus on the issues of loss reserves and gain on sale calculations.”

DISCUSSION

Procedurally, the Court applies the law of Massachusetts that relates to motions under Mass.R.Civ.P. Rule 12(b)(6), which is recited at the start of this memorandum. The law of Pennsylvania, however, appears no different. See, e.g., Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d 270, 272 (Pa. 2005); Estate of Witthoeft v. Kiskaddon, 733 A.2d 623, 624 n. 1 (Pa. 1999). The facts alleged in the Complaint, and the inferences deducible therefrom, control at this time.
The applicable substantive law, when applied to the facts and inferences, may, however, vary the outcome on one or more of the three counts in the Complaint. In assaying the choice of law issue, this Court chooses not to delve into the thicket of the collateral estoppel arguments made by the parties here. The Court does, nevertheless, acknowledge its awareness of Judge Davis’s determination that, in the case before him brought by Fleet against the directors and officers of DVI and DVIFS, the law of Pennsylvania applies. See Fleet National Bank v. Boyle, Slip Copy, 2005 WL 2455673 at *6 (E.D.Pa. 2005).
In Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622 (1985), the Supreme Judicial Court decided “not to tie Massachusetts conflicts of law to any specific choice-of-law doctrine, but [to] seek instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole.” Id. at 631.
In the Complaint here there is only one plaintiff, Fleet, and one defendant, Deloitte. Fleet was a Boston-based bank acting as agent for a syndicate of lenders, none of whom is otherwise based in Massachusetts.
The sole defendant, Deloitte, is an internationally practicing auditing limited liability partnership with a Boston office, but not principally based in Massachusetts. The activities of Deloitte which are the target of this case occurred principally in Jamison, Pennsylvania, by accountants who came mostly from Deloitte’s Princeton, New Jersey office.
The product of Deloitte’s auditing work was contracted for by DVI, a Delaware corporation, based in Pennsylvania, and was delivered to DVI in Pennsylvania. Deloitte had no contractual privily with Fleet, it delivered nothing to Fleet, and it had no communications with Fleet about its auditing product.
Little of the foregoing, which is essentially all that is alleged in the Complaint, or can reasonably be inferred from those allegations, points toward Massachusetts as having the dominant interest in the matter at hand.
On the other hand, there are at least two factors that tilt toward Pennsylvania as the appropriate law to apply.
First are the contentions in the Complaint that Deloitte was part of a conspiracy to commit fraud and aided and abetted fraud. These things, if they occurred, happened almost totally in Pennsylvania, and to a lesser extent perhaps in Princeton, New Jersey. Neither the conspiracy nor the aiding and abetting took place in Massachusetts.
Further, the conspirators, except for Deloitte, are the Pennsylvania-based officers and directors of DVI and its subsidiaries, all of whom, again except for Deloitte, are the conspirators involved in Fleet National Bank v. Boyle, brought in the Federal Court for the Eastern District of Pennsylvania. There, Judge Davis determined that the law of Pennsylvania should apply.
Second is the significant consideration of the justified expectations of the parties.
*680 Certainly Deloitte, the alleged co-conspirator and aider and abettor acting in Pennsylvania and New Jersey, did not expect its activities to be controlled by the law of Massachusetts. Nor would Deloitte expect that the law of Massachusetts would apply to its alleged negligent misrepresentations.
Fleet, on the other hand, has at best a form of lex loci argument that because it is in Massachusetts, albeit acting for a syndicate with all members but Fleet located elsewhere, Massachusetts law should apply. This, however, is just the kind of lex loci argument abandoned, “with good cause,” in Bushkin Associates, supra, 393 Mass. at 631.
This Court, therefore, rules that the law of Pennsylvania applies substantively to all counts of the Complaint.
Having so ruled, the conspiracy count, Count II, must be dismissed as the requisite allegations of “malice” required by Pennsylvania law, see, e.g., Skipworth v. Lead Indus. Assoc., Inc., 690 A.2d 169, 174 (Pa. 1997), have not been, and apparently cannot be, made. At oral argument Fleet’s counsel conceded as much.
Similarly, Pennsylvania law does not recognize a cause of action for aiding and abetting fraud. See Fleet v. Boyle, 2005 WL 2455673, at *13; Daniel Boone Area School Dist. v. Lehman Brothers, Inc., 187 F.Sup.2d 400, 414 (E.D.Pa. 2002).
This then brings the Court to Count I charging Deloitte with negligent misrepresentation.
Recently, the Pennsylvania Supreme Court expressly adopted Section 552 of the Restatement (Second) of Torts. Bilt-Right Contractors, supra, 866 A.2d at 287. In doing so, the Pennsylvania Court explained:
Section 552 sets forth the parameters of a duty owed when one supplies information to others, for one’s own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities. The tort is narrowly tailored, as it applies only to those businesses which provide services and/or information that they know will be relied upon by third parties in their business endeavors, and it includes a foreseeability requirement, thereby reasonably restricting the class of potential plaintiffs.
Id. at 285-86.
At pp. 275-76 in Bilt-Rite, the Court discussed Comment h to Sec. 552 of the Restatement, which reads in part, as follows:
. . . [I]t is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeability to take some action in reliance upon it ... It is sufficient, in other words, insofar as the plaintiffs identify is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.
The Pennsylvania Supreme Court also cited, with approval, the Massachusetts case of Nota Construction Corp. v. Keyes Associates, Inc., 45 Mass.App.Ct. 15 (1998). Given the Appeals Court’s discussion in Nota, at pp. 19-21, as well as the Pennsylvania Supreme Court’s own words in Bilt-Rite, among other things considered, this Court is unwilling to rule that Pennsylvania has limited its application of Section 552 solely to design professionals like architects and will not apply it to others such as auditors.
Further, in Bilt-Rite at p. 285, the Court said:
We are persuaded by these decisions from our sister jurisdictions that: (1) this Court should formally adopt Section 552 of the Restatement (Second), which we have cited with approval in the past, as applied by those jurisdictions in the architect/contractor scenario; (2) there is no requirement of privity in order to recover under Section 552; and (3) the economic loss rule does not bar recovery in such a case. Recognizing such a cause of action, with such contours, is consistent with Pennsylvania’s traditional common-law formulation of the tort of negligent misrepresentation.
Thus, given the allegations in the Complaint, and the inferences to be drawn therefrom, including the 188-page Examiner’s Report, this Court, on a Rule 12(b)(6) motion, is not able to rule that it appears beyond doubt that Fleet can prove no set of facts in support of its claim which would entitle it to relief on the negligent misrepresentation claim. Deloitte cannot surmount Fleet’s “relatively light” burden.

ORDER

For the foregoing reasons, Deloitte & Touche, LLP’s Motion, to Dismiss, Paper # 11, is DENIED as to Count I for negligent misrepresentation, and ALLOWED as to Count II for conspiracy to commit fraud and Count III for aiding and abetting fraud. The denial as to Count I, of course, does not establish the law of this case, and is without prejudice to the service and filing of a future dispositive motion by the defendant after a more full record is established.

Athough the plaintiff is now BoA, because the events in issue took place when Fleet was the agent for the lending syndicate the Court will refer to “Fleet” as the charging party in this memorandum.